[Civ. No. 29737.   Second Dist., Div. Five.   Aug. 10, 1967.]

MURRAY WEISBERG et al., Plaintiffs and Appellants, v. WALTER J. LOUGHRIDGE, Defendant and Respondent.

Miller, Vandergrift, Middleton & Sackin, Morse Taylor and Robert Hillison for Plaintiffs and Appellants.

John E. Crooks and Joseph R. Laird, Jr., for Defendant and Respondent.

THE COURT. — Plaintiffs, Murray and Tillie Weisberg ("Weisbergs"), appeal from a judgment declaring Walter J. Loughridge, the defendant, to be the owner of certain described property. Weisbergs filed the present action seeking declaratory relief and seeking to quiet title to the Best in the West Car Wash ("Car Wash"). After Loughridge's demurrer was overruled, he answered, denying the allegations of the complaint, and filed a counterclaim. The case was tried without a jury and judgment ensued, declaring title to the property in Loughridge.

The dispute arose over the ownership of the Car Wash fixtures and equipment. Weisbergs claimed title through the purchase at a foreclosure sale had on April 12, 1963, of their chattel mortgage. Loughridge claimed title as purchaser at a tax sale held on June 7, 1963, and also that Weisbergs had acquired no rights in the property at the foreclosure sale.

### The Facts

Prior to April 20, 1959, Weisbergs were the owners of the Best in the West Car Wash in Long Beach, California. They leased the land upon which the business was located from White. The term of the lease was until May 14, 1960, with an option to renew the lease for an additional term of seven years, to May 14, 1967. Under the provisions of the lease the lessee promised to pay all taxes assessed against the personal property, fixtures and improvements upon the premises. Unless in default, the lessee had the right to remove the fixtures and equipment during the term of the lease. Any fixtures and equipment not removed during such term became the property of the lessor, White, or, at the option of White, the lessee was required to remove said property.

On April 20, 1959, Weisbergs sold the Car Wash to Hundley, taking a promissory note for the unpaid balance of $47,000, secured by a chattel mortgage, which was duly recorded, on the furnishings, equipment and fixtures of the Car Wash. Weisbergs assigned their rights in their lease with White to Hundley with White's consent. The Weisbergs remained as guarantors under the assigned lease. (*Realty & Rebuilding Co.* v. *Rea* (1920) 45 Cal.App. 673 [188 P. 621].) On November 18, 1959, Hundley and White entered into an "Extension of Lease and Consent to Sublease," whereby

Hundley exercised the option and renewed the lease until May 14, 1967. White consented to the subleasing of the land to Loughridge from November 16, 1959, to November 15, 1961. Hundley sublet the property to Loughridge. Under the terms of the sublease, Loughridge agreed to pay all personal property taxes levied on the Car Wash. This provision restated the obligation under the White-Weisbergs lease and assignment to pay such taxes. He also obligated himself to pay to Weisbergs for the account of Hundley twenty-four monthly installments of $500 each, commencing November 21, 1959. Weisbergs were not aware of the sublease until they received a payment from Loughridge in November 1959. Weisbergs objected to this arrangement and thereafter received some payments from Hundley, which came late. When Hundley explained that the delay was caused by his first having to collect from Loughridge and then forward the payment to Weisbergs, the latter agreed to accept the payments directly from Loughridge. About six months after Loughridge started to operate the Car Wash under his sublease, he told Weisbergs that he wanted to buy the Car Wash, and that Hundley wanted to get off the lease. Efforts to negotiate such a sale and release fell through. No further payments were made by Hundley or Loughridge to Weisbergs after February 1962. When Weisbergs contacted Loughridge about further payments, Loughridge stated, ''I don't owe you anything. What payment are you referring to? Get your money from Hundley. I don't owe you a thing.'' When Hundley was contacted by Weisbergs, he expressed surprise that Loughridge had discontinued paying. The last conversation with Hundley was in August 1962.

The sublease between Loughridge and Hundley granted an option to renew for a period of two years and an option to purchase the Car Wash upon the payment of the sum of $5,000, the assumption of the Weisberg's chattel mortgage, and the assumption of the terms and obligations of the Weisbergs-White lease, which had been assigned to Hundley.

When the sublease expired in November 1961, Loughridge paid Hundley $5.000 for the purchase of the Car Wash and the assignment of Hundley's rights under the master lease. Loughridge did not assume the chattel mortgage, and Hundley's rights under the master lease were never assigned. An extension of the sublease until February 15, 1962, which also contained the terms of the purchase, was signed by Loughridge but not by Hundley. Loughridge testified that he did

not purchase the Car Wash from Hundley but continued to occupy and use the premises.

On May 26, 1962, Hundley made a written offer to White to surrender his rights under the White-Weisbergs lease. On June 13, 1962, Weisbergs filed a complaint to foreclose their chattel mortgage, naming as defendants Hundley and Loughridge. On July 13, 1962, Loughridge and White entered into a lease covering the Car Wash for ten years, commencing June 15, 1962, and ending in 1972. This operated as an acceptance of Hundley's surrender of the lease. (*Welcome* v. *Hess*, 90 Cal. 507, 514 [27 P. 369, 25 Am.St.Rep. 145].) The record does not disclose that either White, Hundley, or Loughridge notified the Weisbergs of the surrender of the White-Weisbergs lease. At the time of entering into the White-Loughridge lease, White had no right, title or interest in the property in controversy.[1] Under the terms of this lease Loughridge promised to pay all personal property taxes upon the property of the lessee just as he had under the sublease with Hundley. The right to remove the Car Wash fixtures during the term of the lease under the same conditions imposed in the Weisbergs and Hundley leases was provided in the White-Loughridge lease, though for a period extending to 1972. While the record is not clear as to the relation between Hundley and Loughridge between November 15, 1961 (the expiration date of the Hundley-Loughridge sublease) and July 13, 1962 (the date of the execution of the White-Loughridge lease and the acceptance of Hundley's offer to surrender lease), it appears that Loughridge held over under the terms of his sublease with Hundley. (*Shenson* v. *Shenson* (1954) 124 Cal.App.2d 747, 753 [269 P.2d 170, 270 P.2d 896] ; *Miller* v. *Stults* (1956) 143 Cal.App.2d 592 [300 P.2d 312].) Under these circumstances Loughridge was obligated pursuant to the terms of his sublease with Hundley and under the terms of the subsequent White-Loughridge lease to pay the taxes assessed against the personal property and fixtures at all times subsequent to November 16, 1959.

On April 12, 1963, all of the property subject to the chattel mortgage was sold at a foreclosure sale of Weisbergs' chattel mortgage to Weisbergs' agent. The procedural validity of this

---

[1]The Whites, in their answer filed in this action, on page 9 thereof, allege as follows: ''I. These answering defendants hereby allege that they have never had and do not now have any right, title or interest in or to any of the property made the subject of this action; and, if any they have, they, and each of them, hereby disclaim the same.''

sale is not disputed. Thereafter, Weisbergs demanded possession from Loughridge of the personal property bought in at the foreclosure sale. Loughridge has at all times thereafter refused to give possession to the Weisbergs.

On June 7, 1963, the same property was sold to Loughridge for delinquent taxes for the periods of July 1, 1961, to June 30, 1962, and July 1, 1962, to June 30, 1963. These taxes were assessed to Hundley, and the bills for such taxes were sent to the Car Wash and were addressed to Hundley. Loughridge forwarded such bills to Hundley. Loughridge made tax payments only when requested to do so by Hundley. No one else requested that he pay the taxes though he was obligated to do so by his lease with White commencing June 15, 1962. Loughridge had notice of the tax delinquency prior to the sale, as the notice was posted on the Car Wash premises for the required statutory period. Weisbergs had no notice of either the tax delinquency or of the tax sale. Loughridge has been in continuous possession and has enjoyed the beneficial use of the Car Wash since November 1959 and is still in possession thereof.

Loughridge spent between $7,000 and $8,000 in repairing the Car Wash after the tax sale.

The trial court decreed that Loughridge was the owner of all of the Car Wash property and that Weisbergs had no right to possession of said property and no lien or encumbrance thereon.

Loughridge rested his title upon his purchase at the tax sale.[2] ■ We have concluded that Loughridge cannot successfully assert whatever interest he may have acquired at the tax sale against Weisbergs. As applied to real property, it has long been settled that ''one who is under a moral or legal obligation to pay the taxes is not in a position to become a purchaser at a sale made for such taxes. If such person permits the property to be sold for taxes, and buys it in, either in person or indirectly through the agency of another, he does not thereby acquire any right or title to the property, but his purchase is deemed one mode of paying the taxes.''

[2]An assignment on July 24, 1963 (some 36 days after Weisbergs filed the present action), whereby White assigned to Loughridge all of White's right, title, and interest in the disputed property, is mentioned in the arguments presented on appeal. We do not consider the effect of this purported assignment, however, because the existence of the assignment was not proved and the record does not contain a stipulation with respect to it. We note, however, that in this document White disclaims his right, title or interest in the property involved and specifically states the Car Wash equipment was not part of the July 13, 1962 lease.

(*Christy* v. *Fisher* (1881) 58 Cal. 256, 258; *Garvey* v. *Byram* (1941) 18 Cal.2d 279, 281 [115 P.2d 501, 136 A.L.R. 1137]; *People* v. *Taliaferro* (1961) 188 Cal.App.2d 372 [10 Cal.Rptr. 724]; *Carberry* v. *Trentham* (1956) 143 Cal.App.2d 83, 91 [299 P.2d 966]; *Gipson* v. *Spears* (1955) 134 Cal.App.2d 370, 376 [285 P.2d 968]; *Dowd* v. *Glenn* (1942) 54 Cal.App.2d 748, 755 [129 P.2d 964]; *Klumpke* v. *Henley* (1914) 24 Cal.App. 35, 40 [140 P. 289, 313].) It has been said " 'that the decisive factor is not whether the obligation to pay the tax rests on the one asserting the tax title, but whether on broad equitable grounds he should be estopped to assert such title.' (134 A.L.R. 294.) " (*Dinkelman* v. *Harrison*, 61 Cal.App.2d 258, 261 [142 P.2d 461].) While the foregoing doctrine has been applied to the purchase of tax-delinquent real property, we find no reason why it should not be applied with equal force to the purchase of tax-delinquent personal property.

The trial court by its findings makes crystal clear that its judgment is founded upon the conclusion that Loughridge obtained title by the tax sale.

Finding 10 states: "It is true that on May 26, 1963, J. R. Hundley executed a document entitled Offer to Surrender Lease on the terms and conditions as are set forth on paragraph 11 of plaintiff's complaint." (The following finding apparently establishes the effective date of surrender, there being no other acceptance.)

Finding 11 states: "It is true that on July 13, 1963, defendants Henry E. White and Grace A. White, as Lessors, entered into a written lease with defendants Walter J. Loughridge and Carol Loughridge, as Lessees, covering the real property hereinabove described. A true copy of said lease is attached to plaintiff's complaint, marked Exhibit E, and is made a part hereof by reference."

Finding 13 states: "It is true that on June 13, 1962, plaintiffs filed their complaint to foreclose the chattel mortgage hereinabove described; the complaint was filed in the above entitled Court under number 798179."

Finding 14 finds as a fact that the foreclosure sale was duly held. (The evidence discloses this took place on April 12, 1963.)

Finding 15 states that it is true as a fact that on June 11, 1963, the Los Angeles County Tax Collector duly sold the same property under a tax delinquency sale.

The facts numbered 10 and 11, as respects the stated dates, are in error.

The inclusion, by reference to plaintiff's complaint, of the document of surrender does not cure the error of fact found by the court; it merely confirms that error. The document as set forth in plaintiff's complaint bears the date May 26, *1963*. However, the complaint alleges and the pretrial order stipulates the date of execution was May 26, 1962. Since findings may be disregarded which are contrary to stipulations of fact in or during the trial, in the opinion of the court we have adopted the facts as stipulated. (*Weller* v. *Chavarria* (1965) 233 Cal.App.2d 234, 250 [43 Cal.Rptr. 364]; *Capital Nat. Bank* v. *Smith* (1944) 62 Cal.App.2d 328, 343-344 [144 P.2d 665]; *Los Angeles Athletic Club* v. *Board of Harbor Comrs.* (1933) 130 Cal.App. 376, 394 [20 P.2d 130]; *Wilson* v. *Mattei* (1927) 84 Cal.App. 567, 573 [258 P. 453].) Further, no finding is necessary on the issue involving a particular fact admitted in the pleadings or by stipulation, for, upon the admission, it is no longer in issue. (2 Witkin, California Procedure (1954) Trial, § 104(e), p. 1835.) Throughout the briefs of both parties in this appeal, the facst have been argued in accordance with those set forth in our opinion.

Loughridge recognizes on appeal that his claim to title of the property upon the strength of the tax sale is not as strong as he would like it. Throughout the trial, however, this was his prime contention. Loughridge testified as follows:

''By Mr. Sackin:

'Q. Mr. Loughridge, when do you claim you have come into the ownership of the personal property at the Best in the West car wash? A. At the tax sale, I imagine.

''Q. That would be, when you say you imagine, are you certain that that is it? A. Yes.

''Q. And that would be the tax sale in June of 1963? A. Yes.''

We recognize that the expression of belief by a party as to a legal principle is not controlling. However, the present contention as to how and when Loughridge claims to have acquired title, *i.e.*, that White acquired title by lease termination and Loughridge acquired title from White, is likewise untenable.

As we have pointed out, Loughridge was obligated under lease from 1959 to pay the personal property taxes, and his purchase at the tax sale, curing his own delinquency, cannot benefit him.

Under this theory, Loughridge seeks to enforce a forfeiture of title to the property as between White and Hundley (or

successor) by virtue of a lease contract provision to which he, Loughridge, was not a party. He seeks to enforce such provision of forfeiture against the intent and desire of both White and Hundley (or his successor). Then, if he claims title by tax sale, by virtue of his own default in payment of taxes (and subsequent tax sale purchase) during a period in part included within the White-Loughridge lease, July 1962 to June 1963, he seeks to divest his landlord of the very title to the property he sought to impose upon the landlord.

Did Loughridge, as he now urges, acquire his title through White? The answer is clear that if White never acquired title to the property he certainly did not intend, believe, or contend that he transferred the same to Loughridge. The portions of the White-Weisbergs lease pertinent to the problem before us reads in applicable parts as follows: "[Sec. 7 of master lease.] [I]t is expressly agreed that if the Lessees be not in default hereunder, they shall have the right, at any time, during the term hereof, to remove from the demised premises all trade fixtures, equipment and machinery, including underground tanks and equipment; . . . Any such fixtures, machinery or equipment of the Lessees not so removed by the Lessees shall remain on the demised premises and title thereto shall pass to, be in and belong to the Lessors. The Lessors shall have the option, to be exercised upon the termination of this lease or the expiration of the term hereof, to require Lessees to remove any underground fixtures, machinery or equipment. . . ."

As previously noted, Loughridge commenced possession of the Car Wash in November 1959 and White consented thereto. Within this sublease was a provision for renewal of the lease and also an option to purchase the White-Weisbergs lease as assigned to Hundley, also the option to purchase the Car Wash equipment upon the assumption of the Weisbergs-Hundley chattel mortgage.

Loughridge's position is that the right of the mortgagee (or purchaser at the foreclosure sale) to remove the property from the land is no greater than the right of the mortgagor, and the mortgagor, Hundley, lost this right when his offer to surrender his lease with the landowner, White, was accepted on July 13, 1962 (or if we were to believe the findings, July 13, 1963).

There is no contention here that the lessee was "in default hereunder." The lease specifically provides the right to remove the property at "any time during the term

hereof." The lease specifically distinguishes between "termination" and "the expiration of the term hereof." The acceptance of the offer to surrender the lease did not affect the right to remove "during the term." In *Pringle* v. *Wilson* (1909) 156 Cal. 313, 317 [104 P. 316, 24 L.R.A. N.S. 1090], the court stated the applicable meaning of "expiration of the term" to mean an ending of the term by the lapse of time provided for in the lease for its duration. This same meaning is evident in the words used in the White-Weisbergs lease "during the term hereof." The term thereof, by exercised option to renew, continued to May 14, 1967. See *Borchers Bros. Co.* v. *Ciaparro* (1931) 211 Cal. 507 at p. 511 [295 P. 1035] where the court, construing a provision in the lease before it, stated:

"As for section 11, it is true that it provides that 'except for certain changes . . . any alterations in, or improvements on said premises, made or constructed by said lessees during said term, or extension thereof shall remain on said premises after the expiration of said term or extension. . . .' But clearly this provision speaks as of the lawful expiration of the ten-year period or any extension thereof and it does not speak of the situation which shall obtain in the event of rescission by a failure of consideration or by operation of law of the lease prior to the expiration of the term thereof. Consequently, we hold that this provision is inapplicable to the parties in their present situation. (See *Pringle* v. *Wilson*, 156 Cal. 313 [104 P. 316, 24 L.R.A. N.S. 1090].)"

That there was accomplished a surrender and termination of the lease by the acts of Hundley and White there is no doubt. As stated in *Wiese* v. *Steinauer* (1962) 201 Cal.App.2d 651, 656 [20 Cal.Rptr. 295], " ' "A surrender of demised premises occurs only through the consent or agreement of the parties evidenced either by an express agreement or by an unequivocal act inconsistent with the terms of the lease and with the relation of landlord and tenant, or by acts so inconsistent with the terms of the lease as to imply in law an agreement to surrender, and hence, an acceptance by the landlord is requisite." ' (*Martin* v. *Cassidy*, 149 Cal.App.2d 106, 111 [307 P.2d 981], 32 Am.Jur., § 901, p. 763.)" This termination of lease did not foreclose the lawful party to possession of the property here involved to enter for the limited right of removal "during the term" of that lease.

As is stated in *Cone* v. *Western Trust & Sav. Bank* (1937) 21 Cal.App.2d 176 at p. 181 [68 P.2d 981], "After the expira-

tion of the lease, plaintiff was not entitled to possession of the premises but was merely entitled to the right of ingress and egress for a limited time and for the limited purpose of removing the property. (36 Cor. Jur. 64, sec. 682.)"

In the case at bar, Weisbergs had no right to possession for all purposes once their assignee had effectively terminated (by accepted surrender of) the White-Weisbergs lease. The right to enter and reduce to possession that which had been designated "personal property"[3] was twofold: (1) by right of chattel mortgage after foreclosure; (2) by privity of contract, though not of estate, with White. See *Churchill* v. *More* (1906) 4 Cal.App. 219 at p. 223 [88 P. 290], where the court states:

"The chief contention of the appellant is that the casing in controversy is shown to have been so affixed to the soil that by the conveyance to More the same passed to him by the deed under the recognized rule that chattels attached to the freehold by the owner and contributing to its value and enjoyment pass by the grant. This rule, however, is that applying between vendor and vendee in the absence of a contract to the contrary. But it has long ago been modified as applying to the rights of landlord and tenant (*Fratt* v. *Whittier*, 58 Cal. 126 [41 Am.Rep. 251]), and was never a proper rule between any class when its enforcement would be to impair the obligation of a contract with reference to the right of removal. In the case under consideration, were ambiguity in the contract conceded, its construction should be in the favor of the lessee. (Civ. Code, § 1069.) But, we think, giving effect to the words 'at any time' as employed in the lease, they were intended to and did give the right of removal to the lessee of the property placed thereon, even were such right not exercised during the life of the lease. More is shown to have accepted the conveyance with notice of the plaintiff's claim, and in fact is shown to have recognized the same at one time after acquiring title to the land.

"Appellant contends further that, there being no proof of an assignment of the lease to the Seaboard company, no ownership in the casing is shown in said company; hence no title thereto passed to plaintiff by the sheriff's sale on execution. There is evidence, however, that the possession of all this

[3]Property may retain its personal character or be removable as personalty, even though affixed to the land, and an agreement so providing is valid. (See *Cone* v. *Western Trust & Sav. Bank, supra,* 21 Cal.App.2d 176, 179.)

casing was in the Seaboard company long before the suspension of work and at the date of the levy of the execution. This is *prima facie* proof of ownership. (*Goodwin* v. *Garr*, 8 Cal. 616; *Kelly* v. *Mack*, 49 Cal. 523; *Hewitt* v. *San Jacinto etc. Irr. Dist.*, 124 Cal. 186, 191 [56 P. 893].)''

It is interesting to note that in the last cited case the court had before it a title holder by foreclosure of chattel mortgage. We likewise have Weisbergs as title holders by foreclosure.

Viewing the facts most favorably to Loughridge, the property in dispute consists of trade fixtures which are removable under the conditions of section 1019 of the Civil Code; also ''equipment'' which under the lease was treated in the same manner. Pursuant to that section a tenant may remove trade fixtures within the term of the tenancy. Once the term is ended, unless the contract of the landlord and tenant enlarges the right to remove, the fixtures become the property of the landlord. (*Earle* v. *Kelly* (1913) 21 Cal.App. 480, 484 [132 P. 262].) While it is true, in the absence of an agreement between the parties, fixtures which are attached to the real property pass with a conveyance of the latter (and a right to remove such property during a tenancy under lease expires on termination), an agreement that an attached article shall retain its character as personal property and remain removable is binding between the parties to the agreement. (*Dauch* v. *Ginsburg* (1931) 214 Cal. 540, 544 [6 P.2d 952]; see also, *Bedell* v. *Mashburn* (1948) 87 Cal.App.2d 417 [197 P.2d 98].)

The rights of the chattel mortgagee to remove the fixtures from the land is derivative. He cannot assert a greater right against the landlord than can the mortgagor-tenant. (*Rinaldi* v. *Goller* (1957) 48 Cal.2d 276, 281 [309 P.2d 451]; *United Pacific Ins. Co.* v. *Cann* (1954) 129 Cal.App.2d 272, 275 [276 P.2d 858].) Under the White-Weisbergs lease, as assigned to Hundley, the option was in White as to whether he would receive title on default by the lessee or on termination of the lease, or require the tenant to remove the same. By continuing at all times to recognize a right of removal under continuing tenancies ''during the term of the lease,'' and by his disclaimer, White has waived any claim of title to or interest in the subject property which he may have had by operation of law or by contract. The case of *United Pacific Ins. Co.* v. *Cann, supra,* at page 274 recognizes that a landlord who may, by operation of law or otherwise, be entitled to ownership of equipment upon property may relinquish such right to the owner-tenant:

"As to the incinerator appellants claim that respondent during the trial relinquished any claim to it and a reading of the record satisfies us that this is correct. While one Wall, respondent's yard superintendent, was being examined on direct as a witness for respondent he testified concerning the incinerator: 'So far as the Alaska Packers are concerned, anybody that would remove it would be entitled to it.'

"Thereafter on cross-examination of the same witness the following occurred:

" 'Mr. Dannenbrink: Q. The issue narrows down, Mr. Wall, the way I understand it, to a dispute over the small marine ways, the large marine ways, the electric wiring and the incinerator? A. The incinerator out, because—

" 'Q. All right. You are making no claim to the incinerator, is that it? A. Not worth any, can't be used, it is a liability on the property.'

"Counsel for appellant then desisted from cross-examination concerning the incinerator and went on to the other matters. We are not holding that its yard superintendent, called as a witness by respondent, could waive a claim asserted by respondent. But here in the face of the witness' statements counsel for rspondent remained silent. No objection was made to the question: 'You are making no claim for the incinerator, is that it?' and when the witness answered in the affirmative counsel for respondent did nothing to disavow his action. We are satisfied that on the state of this record counsel for respondent by their conduct must be held to have acquiesced in the withdrawal of any claim to this item by their own witness who was at least a responsible employee, and that counsel for appellants were reasonably entitled to understand what had occurred as having that effect.''

To like effect is the case of *McComish* v. *Kaufman* (1919) 43 Cal.App. 507, particularly the concurring opinion, pages 511-512 [185 P. 476] thereof: ''It [oral testimony of agreement to remove property] was not offered to vary the contract as it was written in any respect or to substitute new terms for those expressed in the writing. Its sole purpose was to show the reason why the lessee asked for and secured an extension of the lease for one month. The obvious purpose of the testimony was to show that the plaintiff recognized the defendant's ownership of the furniture and fixtures and his right to remove them upon the expiration of the term, and that his failure to remove the property within the original term or at

the expiration thereof was because he did not have sufficient time within which to do so. . . ."

Loughridge at all times had full knowledge of the existence of the chattel mortgage and the obligation thereon of Hundley to Weisbergs.

Hundley was never released from his obligation under the chattel mortgage by Weisbergs. White consistently recognized the continuing interest in the property by Hundley. Weisbergs, by foreclosure, took the interest Hundley had. Loughridge had knowledge of Hundley's interest in the equipment and the chattel mortgage, and held and used such equipment as a bailee thereof. One who is in possession of personal property as a bailee and thereafter converts it by excluding therefrom the person rightfully entitled to possession without the consent of the owner is liable for its reasonable value. (Rest.2d Torts, § 237; *Chatterton* v. *Boone* (1947) 81 Cal. App.2d 943 [185 P.2d 610].) If property belonging to a tenant is left on the premises, the landlord or subsequent lessee, on taking possession of the premises, becomes an involuntary bailee of such property. (*Warwick* v. *Macchiaroli* (1929) 96 Cal.App. 133 [273 P. 1109].)

In order for Weisbergs to prevail they must establish a right in themselves through their mortgagor to remove the property after April 12, 1963, when Weisbergs demanded possession. Since Loughridge was a bailee of the fixtures and did not assume the mortgage, Weisbergs cannot claim any right directly through Loughridge. (Cf. *United Pacific Ins. Co.* v. *Cann, supra,* 129 Cal.App.2d 272, 277.)

The purpose of the rule limiting the mortgagee's rights to those of his mortgagor is to protect the landlord. " '. . . The law will neither impose upon the landlord a duty nor necessity of either housing or taking care of the fixtures which his tenant leaves behind after his term has expired. Neither will the law permit the tenant nor anyone claiming under him, to re-enter the premises, for the reason that to do so would encourage breaches of the peace, and would in many cases hazard and impair the landlord's rights of leasing the premises to another tenant, and lessen the full and free enjoyment of those premises by such tenant.' " (*Rinaldi* v. *Goller, supra,* 48 Cal.2d 276, 281.)

This rule has been applied in the California cases in situations where the policy of protecting the landlord was applicable. The *Rinaldi* and the *Cann* cases involved mortgagor tenants who abandoned the premises. Under such circum-

stances the rule is properly applied because the landlord should not have his property encumbered preventing him from reletting it. However, the situation in this case is different since there was no abandonment of the premises.

Though we have searched for a California authority on our precise problem we have been but partially successful. However, the case of *Gibson* v. *Exchange Nat. Bank of Pauls Valley* (1935) 172 Okla. 106 [42 .P.2d 511], is of the same pod. Even the language of the applicable Oklahoma code section (§ 11730, O.S. 1931) is substantially verbatim with that of Civil Code section 1013. In *Gibson,* the plaintiff sought to recover the value of certain alleged personal property on the theory the same had been wrongfully converted by the defendant. Defendant was the owner of a business building in Pauls Valley. For some years prior to March 1, 1929, one Scott Morley, as tenant, operated a restaurant therein. Morley had given Exchange National Bank a chattel mortgage on the restaurant furniture and fixtures, and the obligation so secured was past due on March 1, 1929. On March 1, 1929, Morley closed his doors and quit his business though he was tenant under a three-year lease commencing January 1, 1928. He quit paying rent under his lease and delivered his key to the building to Gibson and surrendered possession, leaving furniture and fixtures in place.

The Exchange National Bank on April 10, 1929, was notified by Gibson to remove from the building property in which it claimed an interest. In process of compliance, Exchange National Bank sought to remove 29 mirrors which had been affixed to the walls by wooden pegs, three ceiling fans attached by screws to the ceiling, and a suction fan attached by bolts to the building. Gibson prevented the removal of this property, claiming title thereto by attachment to the building. This action resulted, with the Exchange National Bank claiming title to the items as personal property, properly classified as trade fixtures and removable as such. With this contention the court concurred after noting that Morley had knowledge and expectation that such fixtures would be affixed. The court said:

"The right of a tenant to remove trade fixtures when the removal can be accomplished without substantial injury to the premises is recognized by statute in this jurisdiction. Section 11730, O.S. 1931, provides: 'When a person affixes his property to the land of another without an agreement permitting him to remove it, the thing affixed belongs to the owner

of the land, unless he chooses to require or permit the former to remove it: Provided, that a tenant may remove from the demised premises at any time during the continuance of his term any thing affixed thereto for the purpose of trade, manufacture, ornament or domestic use, if the removal can be effected without injury to the premises, unless the thing has, by the manner in which it is affixed, become an integral part of the premises.'

"Since the tenant might rightfully remove the trade fixtures, it follows that the mortgage of the tenant with his consent (which the record discloses was obtained in the case) might exercise the same right. The decision of the trial court on this question is therefore affirmed." (42 P.2d at p. 512.)

Then the court turned to the question primarily posed to us in the case at bar and reasoned as follows:

"It is next urged by the defendant that the removal of trade fixtures by a tenant or his mortgagee must be accomplished during the tenant's possession under the lease, and that the plaintiff bank in this case could not rightfully remove the property in question after the surrender of the leased premises.

"Many authorities are cited in defendant's brief to the general effect that a tenant must exercise his right of removal during his term and that a mortgagee of the tenant has no greater right of removal than the tenant.

"Indeed, such seems to be the general, though not universal, rule. It is in accord with our statute (section 11730, O.S. 1931, *supra*), which affirms the right of a tenant to remove 'during the continuance of his term.'

"However, it has no application to this particular case. We are confronted with a situation in which a tenant surrendered possession during his term by agreement between himself and the landlord. The applicable rule is stated in 26 C.J. 718, as follows: 'That the leasehold is surrendered by the tenant does not, by the weight of authority, affect the right of removal by one to whom the fixture has previously been transferred or mortgaged.'

"Manifestly, the recognition of any other rule would give rise to situations in which mortgagees would be deprived of property rights without any opportunity to protect themselves. Simple justice requires that the mortgagee be given an opportunity and a reasonable time to remove mortgaged property from leased premises when the lease has been surrendered by the tenant prior to the expiration of the term." (42 P.2d at p. 512-513.)

Our search, in addition to the cases cited throughout this opinion, disclosed a succinct opinion by Justice Heydenfeldt, with Justice Wells concurring, in the case of *Gaskill* v. *Trainer* (1853) 3 Cal. 334. There, one Trainer held a leasehold subject to two conditions, payment of rent and that lessee should immediately expend $10,000 on the premises in erection of buildings. One Gaskill had a lien attached to Trainer's leasehold interest. Trainer could not comply, and delivered the premises to one Moor, in accordance with lease permission.

The lease provided that Moor may terminate tenancy on non-payment of rent; Moor elected to so terminate. It was urged that Moor, in possession at time rent became due, could not have entered on the ground of forfeiture; he could not reenter upon his own possession. Trainer had waived his right of demand for possession by confessing his inability to pay and delivering possession to Moor.

Did the surrender of lease by Trainer and termination thereof by Moor terminate the estate as against Gaskill? The justices said (pp. 339, 340) :

"The first proposition of the respondent is correctly stated, that Gaskill's lien attached only on Trainer's leasehold interest, subject to all the conditions of the lease from Moor to Trainer.

"From this it is attempted to be deduced, that as by the terms of the lease, it was to be forfeited upon nonpayment of rent, the failure of the lessee to pay, destroyed the lien of the plaintiff.

"This would be only true, if there had been a technical forfeiture. The failure to pay, cannot alone create one. There was an equal necessity that a formal demand for the rent should have been made on the day it became due. Nor for the purpose of forfeiture, will a waiver of the demand ever be implied, because a forfeiture, from its very nature, cannot take place by consent, and it is not favored by the rules of law.

"Having declined to take the legal steps to produce the forfeiture, Moor, it is said, received the leasehold estate by surrender, and that consequently the rights of all parties derived under the lease were determined with it. Such a rule would be fraught with hardship and inconvenience, and has no legal sanction. If he took by surrender, the estate must nevertheless be subject to the burdens with which it was invested at the time; for although by the surrender, the leasehold estate is merged in the fee, yet this principle of merger

which arose out of the fondness of the law for convenience and symmetry, was never designed to defeat the rights of a third party, which had intervened before the merger took effect.''

A more recent case closely in point and distinguishing the cases permitting removal of fixtures only during tenancy and not after expiration or termination of lease is *Clark* v. *Talmadge* (1937) 23 Cal.App.2d 703 [74 P.2d 825]. The following language therefrom expresses the law as we have here expressed it:

''It is next urged that the decision of the court and its finding and conclusions of law, to the effect that the respondent is the owner of this property, are against law and contrary to the evidence. The argument under this head is based upon the contention made throughout that there was no agreement for the removal of this property, that this property was not within the exception relating to trade fixtures and, under general laws relating to landlord and tenant, became a part of the real property, and that, in any event, it was not removed within a reasonable time after the termination of the lease.

''With certain exceptions, the general rule is that buildings or equipment which are attached to real property in such a manner as to become what is known as fixtures, may not be removed by a tenant at the expiration or termination of his lease. It is well settled, however, that a different result obtains where the parties have by express agreement provided that the tenant may remove the improvements. (*Earle* v. *Kelly*, 21 Cal.App. 480 [132 P. 262]; *Stewart* v. *Leasure*, 12 Cal.App.2d 652 [55 P.2d 917]; *Churchill* v. *More, supra*; *Clawson* v. *Harris*, 10 Cal.App.2d 521 [52 P.2d 496]; *R. Barcroft & Sons Co.* v. *Cullen*, 217 Cal. 708 [20 P.2d 665].) It has also been held that a tenant who has an express agreement permitting him to remove fixtures has a larger right as to the time within which they must be removed than is the case where no such agreement exists, and that he may remove them within a reasonable time after the expiration of his term. (*Earle* v. *Kelly, supra.*) It is here contended that the right to remove the property after the termination of the lease, even under such an agreement, does not apply where the lease is ended before its expiration date because of a failure to pay rent. In support of this contention the appellant cites the early case of *Whipley* v. *Dewey*, 8 Cal. 36, where the court said that in agreeing to allow the removal of erections 'after expiration of

the lease' the intention of the parties was confined to the *legal* expiration thereof by the terms of the limitation itself. The case before us involves a very different agreement, a different intention appears both from the language of the lease and the conduct of the parties, and the fact that the property here in question was to remain personal property which could be attached as property of the lessee and which could be removed was recognized by the appellant after the covenant for rent was broken, after she had elected to terminate the lease, and even after she had regained possession. We take it that the right of removal after failure to pay rent and a resulting termination of the lease, still exists if it is so agreed by the parties. That is the situation here, where the agreement that the added improvements are to remain the property of the lessee specifically makes them subject to removal at the termination of the lease rather than at the expiration thereof. This interpretation of the lease has been accepted and acquiesced in by the appellant as shown by her conduct and this furnishes the best evidence of the intention of the parties. By attaching the property after the covenant for the payment of rent was broken and after she had taken steps to terminate the lease she recognized not only that the property in question was personal property but that it belonged to the lessee .After regaining possession of the real property, upon being told of the intention of the lessee to turn the personal property over to the respondent the only objection she made was that she would not allow him to remove it until he could show a paper, in other words, an evidence of title. When told that she would be furnished such evidence she agreed that this should be done. Under the circumstances here appearing we think the court was justified in holding that the lessee, or his assignee, then had the right to remove the property within a reasonable time.'' (*Id.* at pp. 706-708.)

As in *Gibson, Gaskill* and *Clark,* the offer to surrender the lease tendered by Hundley and accepted by White did not, in equity or in law, foreclose Weisbergs from recovering the property reserved for removal during the term of the lease. Nor did it create any title in White to such property, and the unfounded claim of Loughridge to that which he holds but as bailee cannot be sustained.

The judgment is reversed.

Respondent's petition for a hearing by the Supreme Court was denied October 5, 1967.