469 P.2d 45

Kenneth G. OLSON and Gary Olson dba Olson Construction Company, Plaintiff-Appellant,

v.

QUALITY–PAK COMPANY, a Co-partnership consisting of Max Mortensen and Golden Linford, Defendant-Respondent.

No. 10576.

Supreme Court of Idaho.

April 30, 1970.

(4) $2,250 when ends are erected, vents are placed and cellar is covered with dirt.

The contract furthermore provided that construction was to be completed by September 1, 1966. As heretofore stated the third payment ($2,500) was due "when rafters are up and sheeting is placed thereon." Upon Olson Construction Company's request for the third payment, in the early part of September, Quality-Pak asked Olson to cable the cellar in the middle in order to prevent it from collapsing. This Olson did, and the third payment ($2,500) was subsequently made on the 3rd of October, 1966. The evidence indicated that the Olson Construction Company was aware of the fact that Quality-Pak had 800 acres of potatoes which required storage by the fall of 1966. As previously stated, the contract expressly provided that construction was to be complete by the 1st of September, 1966. However the cellar was not in fact completed until the 28th of October, 1966. In order to avoid damage to its potato crop, Quality-Pak, during the latter part of September, began to store the potatoes in the incomplete cellar.

Olson Construction Company (plaintiff-appellant) commenced suit in the district court against Quality-Pak (defendant-respondent) for the unpaid balance of the contract price ($1,746). Quality-Pak counterclaimed for damages in the amount of $10,000 alleging that by reason of the failure of Olson Construction Company to complete the cellar, their potatoes became frozen.

Subsequent to trial without a jury, the following judgment was entered:

Quality-Pak is entitled to judgment on its counterclaim against Olson Construction in the sum of $4,050 which represents a loss of 2700 cwt., and that plaintiff (Olson) is allowed to setoff against that judgment the contract sued upon in the sum of $1,746.

Olson Construction Company has appealed from the judgment and order of the district court denying plaintiff's (Ol-

Sharp, Anderson & Bush, Idaho Falls, for appellant.

Rigby & Thatcher, Rexburg, for respondent.

DONALDSON, Justice.

On June 28, 1966, the Olson Construction Company (plaintiff-appellant) and the Quality-Pak Company (defendant-respondent) entered into a written contract whereby Olson Construction was to build a potato cellar for Quality-Pak in consideration of the sum of $10,250. The terms of payment were prescribed as follows:

(1) $2,000 when the contract is entered into;

(2) $3,500 when hole is dug, footings are in, and logs delivered;

(3) $2,500 when rafters are up and sheeting is placed thereon;

son's) motion to amend the findings of fact and conclusions of law.

■■■■ The fundamental question posed by this appeal is whether the delay in the completion of the contract for the construction of the potato cellar was in fact attributable to: (1) the allegedly late third payment made by Quality-Pak or (2) cabling work demanded by Quality-Pak. The record reveals a conflict in the evidence as to the date that the "rafters were up and sheeting placed thereon." However this date becomes immaterial in the case since the record indicates that the written agreement was modified by subsequent oral negotiations between the parties.[1] Subsequent oral negotiations may vary the terms of a written contract. Haskins v. Curran, 4 Idaho 573, 43 P. 559 (1895); Brooks v. Beach, 50 Idaho 185, 294 P. 505 (1930); Smith v. Washburn-Wilson Seed Co., 54 Idaho 659, 34 P.2d 969 (1934); Idaho Gold Dredging Corp. v. Boise Payette Lumber Co., 62 Idaho 683, 115 P.2d 401 (1941). The evidence indicates that Olson Construction acquiesced in Quality-Pak's demand and thereby: (1) agreed to perform the cabling; (2) agreed to accept payment (the third payment) after the cabling was completed. Prior to Olson's acquiescence to Quality-Pak's demand, Olson was under no obligation to do the extra cabling. This Court can only speculate as to the reason Olson Construction complied with the demand. In any case, Olson thought it best to do as Quality-Pak requested. However Olson Construction may not now excuse itself ·under the guise of "extra work" when in fact the work was *not* "extra," but rather became an integral component of the original contract. It is now bound by that modification and its attendant consequences.

■■■■ As a general rule, an oral modification of a single· provision of a written contract has no effect upon the unmodified terms and they remain unaltered by the subsequent oral modification. However in the case at bar the record reveals that it was impossible to complete the contract by the date originally agreed upon in the written contract (September 1, 1966) because the cabling work was not requested until about September 1, 1966.[2] The

1. Testimony of Max Mortensen, partner in the firm of Quality-Pak:
   "Q. Now, you did request the cabling in the center, did you?
   A. Yes.
   Q. And do you agree that this was not provided for in the contract?
   A. Specifically it probably wasn't. Apparently it didn't state specifically, but we had been warned by another party that a long pit like that if it wasn't trussed very well it would probably fall over and we aren't experienced and it worried us and it was recommended to us by others who did have a lot of experience.
   Q. This was an extra, wasn't it from the original contract?
   A. I suppose it is specifically not, although, I would assume any contract to build a pit would provide that it would be constructed so it wouldn't fall over.
   Q. True, but isn't there a term about cables as to where cables should be in the contract itself?
   A. Right now I don't know. I would have to read the contract again.
   Q. Paragraph 3, I think, is the one that refers to it.

   A. (Reading) 'Cables on both ends for extra strength.'
   Q. So it didn't provide for the cable in the center?
   A. No." (See also, F.N. 2).

2. Testimony of Kenneth G. Olson, partner in Olson Construction Company.
   "Q. Would you, then, state what was said?
   A. I told him that payment was due on the construction and he said no he had just paid us and I said, 'There's another one due,' and he said, 'Well, meet me up to Rexburg the next morning and we will look at the contract and see,' and, so, I was up the next morning and looked at the contract. He got the contract out and he said, 'Yes, it's due.' Then, he said, 'Well, we won't pay you until you cable the middle of the cellar.'
   MR. THATCHER: We didn't hear that answer. Could we have the witness repeat it, please?
   THE WITNESS: They told me when they were looking at the contract, they realized the payment was due, but they said that they wouldn't pay me until I

**610**

question then posed is, "How much additional time was Olson Construction entitled to for cabling the middle of the cellar?" The record indicates that Olson needed about a week "to complete the cabling." [3] Thus the maximum period of delay occasioned by Quality-Pak's request to cable the middle of the cellar amounted to no longer than one week. An excused delay of one week in completion would still not bring the appellant within compliance of the terms of the contract since the work was not completed until October 28, 1966.

■ As to the delay in the third payment which was to be made after cabling was completed, the record does not indicate the precise date upon which the cabling work was completed but it appears from the record that it was some time around September 15, 1966. However there is testimony indicating that whenever Olson did in fact complete the cabling job, it did not inform Quality-Pak of the completion nor did it ask Quality-Pak for the third payment at this time.[4] It was Quality-Pak that notified Olson that it was prepared to make the third payment.[5] Under these circumstances it cannot be said that Quality-Pak delayed in making the third payment. Moreover assuming arguendo that payment was delayed, such delay was waived by Olson's failure to notify Quality-

Pak that the cabling was complete and that payment was due.

■ Appellant also contends that it was error for the trial court to award damages to Quality-Pak since damage to a crop by the elements is too remote and speculative for allowance. It is true that where the evidence discloses that the damages to a crop are remote and speculative they may not be recovered. Lockwood Graders of Idaho v. Neibaur, 80 Idaho 123, 326 P.2d 675 (1958). However this Court endorsed the following definition of "remote damages":

"'Remote damages. Remote damages are such as are the result of accident or an unusual combination of circumstances which could not reasonably be anticipated, and over which the party sought to be charged had no control.'" Lockwood Graders of Idaho v. Neibaur, *supra*, at 128, 326 P.2d at 677, 678; See also, 25 C.J.S. Damages § 2, p. 623.

Two questions are posed when attempting to determine whether or not damages are too remote for allowance, viz., (1) were the damages the result of accident or an unusual combination of circumstances which could not reasonably be anticipated? (2) Did the party sought to be charged (Olson Construction Company) have control of these circumstances? The record clearly indicates that the damage to the potato crop

---

cabled the middle of the cellar, too, which was extra work. It wasn't in the contract.

Q. (By Mr. Anderson) What else was said?

A. All I said was, 'Okay,' and left.

Q. Did you discuss whether or not this was in the contract?

A. No.

Q. Did you, then, subsequently cable the middle?

A. Yes.

Q. And how much later, following the conversation, was it that you put the cable up?

A. It was probably about a week that it was completed.

Q. This would still have been the early part of September?

A. Yes."

3. See F.N. 2.

4. Kenneth G. Olson testified that the third check was due in early September (September 3, 1966). This was before the cabling was completed.

"Q. Well, now, this third check, after you went in and met with Mr. Mortensen, did you ever go back and ask for that check again?

A. No. On the third check?

Q. Yes, the third check, just the meeting with him in the office when he talked about cabling the middle was the only time you asked for that check?

A. Yes."

5. Testimony, Kenneth G. Olson.

"Q. How did you receive notification that they were ready to pay on this stage payment?

A. One day Albert Jones told me when I seen him that one of them told him to tell me that they had a check for me."

was caused by frost. The completion date agreed upon by both parties was September 1, 1966. The testimony reveals that the purpose of requiring the September 1 completion date was to protect against the frost. This fact was made explicitly clear.[6] Therefore the first question must be answered in the negative since it is readily apparent that the damages were caused by a combination of circumstances which could reasonably be anticipated and which were in fact anticipated by the parties. The second question must be answered in the affirmative since Olson Construction controlled the building of the potato cellar and presumably paced its construction timetable upon a September 1, deadline.

The normal measure of damages for delay in constructing a building would be the rental value of the building for the period of delay. 5 Corbin on Contracts, § 1092 (1964); 13 Am.Jur.2d, Building and Construction Contracts, § 76. The evidence is undisputed that the fair rental value for a potato cellar is 10¢ per hundred weight, which measured by the capacity of the cellar herein involved would be $7,000 for the season. Transportation costs to the alternate place of storage would also be a factor in assessing damages. The district court however assessed damages on the following basis: The reasonable value of the potatoes which were frozen would have been $1.50 per cwt. (hundredweight). Approximately 5,500 cwt. of potatoes were lost by Quality-Pak on account of the frost. However since Quality-Pak failed to avoid damages to all 5,500 cwt. of potatoes by separating those potatoes already damaged by frost from those which were not yet contaminated, and the evidence indicated that one half of the 5,500 cwt. of potatoes which were in fact damaged by frost could have been saved had they not been stored next to the contaminated potatoes, the court reasoned that damages should be allowed for only half the potatoes lost, i. e., 2,700 cwt. @ $1.50 per cwt. or $4,050. Since the measure of damages allowed by the trial court was less than it would have been under the alternative method of assessment set forth above, it cannot be said that the trial court erred in its conclusion as to the amount of damages sustained by Quality-Pak.

Furthermore it has long been a rule of this Court that findings of fact made by the district court which are supported by substantial and competent, though conflicting, evidence will not be disturbed on appeal. Jones v. Big Lost River Irr. Dist., 93 Idaho 227, 459 P.2d 1009 (1969); Riley v. Larson, 91 Idaho 831, 432 P.2d 775 (1967); Meridian Bowling Lanes v. Brown, 90 Idaho 403, 412 P.2d 586 (1966).

Judgment affirmed. Costs to respondent.

McFADDEN, C. J., and McQUADE, SHEPARD, and SPEAR, JJ., concur.

---

6. Testimony of Kenneth G. Olson, Olson Construction Company.

"Q. Did you know they were raising substantial acres of potatoes in the area of the potato cellar?

A. Yes.

Q. And did you know that they had to have a place to store those potatoes that fall?

A. Yes.

Q. And did they tell you that they had to have that completed by September 1st so they would have a place to store those potatoes?

A. Yes.

Q. And you are from this country, aren't you, Mr. Olsen? [sic]

A. Yes.

Q. And you know that any time after the 15th or 20th of September frost may be expected?

A. Yes.

Q. And if a potato is not in closed storage with frost, it could be damaged?