577 P.2d 347

**Robert C. NORA, Sr., d/b/a Mosell's Trucking, Plaintiff-Respondent,**

**v.**

**SAFECO INSURANCE COMPANY, a corporation, Defendant-Appellant.**

**No. 12405.**

Supreme Court of Idaho.

April 11, 1978.

Peter J. Boyd and James D. LaRue of Elam, Burke, Jeppesen, Evans & Boyd, Boise, for defendant-appellant.

Lloyd J. Webb of Webb, Burton, Carlson & Pedersen, Twin Falls, for plaintiff-respondent.

DONALDSON, Justice.

The plaintiff-respondent, Robert C. Nora, is a track buyer, defined by Idaho law as an individual who buys and sells agricultural commodities. He worked in Southern Idaho buying and selling hay and grain. Nora began this business in mid-1974. From 1966 until 1974 he had worked as a trucker, hauling agricultural commodities.

At the time Nora first engaged in the track buying business in 1974, he was not licensed or bonded, a requirement imposed by Idaho law. He testified at trial that he was not aware of these requirements when he started his track buying business. Nora was informed by the State Department of Agriculture in January 1975 of this requirement. He was allowed to continue in his business, with the cooperation of the Department of Agriculture, until he acquired his bond and license.

In early September 1975, Nora contacted Mr. Kenneth Dodds, the defendant-appellant's (Safeco's) agent in Kimberly, Idaho, to acquire a bond. On September 11, 1975, at a meeting in Mr. Dodds' office, Nora was informed by Mr. Dodds personally and by a Mr. Erickson, Safeco's Seattle representative, over the telephone of the requirements he would have to meet to acquire the bond. One requirement was the posting of $10,000 in collateral and the signing of a collateral pledge agreement. At this meeting between Nora and Mr. Dodds, Nora endorsed a times saving certificate in the amount of $10,000 to Safeco as collateral and received the track buyers bond. The collateral pledge agreement was not signed this day because it had to be sent from Seattle. Arrangements were made between Mr. Dodds and Nora to sign this agreement when it arrived. When the agreement arrived a few days later, Nora refused to sign it. Nora questioned a provision in the agreement allowing Safeco to use his collateral to settle claims filed against the bond without his consent or participation. On September 23, 1975, at a meeting between Nora, Mr. Dodds, and Mr. Erickson, Nora proposed a supplemental agreement to eliminate what he saw as a problem in the Safeco agreement. Mr. Erickson told Nora at this time that if they could not settle the collateral pledge agreement problem, the bond would have to be canceled and Nora's collateral would be retained for a reasonable time after the cancellation of the bond in case claims were filed against the bond. Ultimately, the parties could not resolve their differences concerning the form of the collateral pledge agreement. Consequently, the bond was canceled on September 26, 1975. Notice of cancellation was mailed to the Department of Agriculture on September 29, 1975 making the effective date of the cancellation November 29, 1975. Nora's collateral was not returned until March 1976 after he filed suit.

Mr. Erickson and Mr. Dodds testified at trial that Nora indicated at their meetings that he understood that his collateral would be retained for a reasonable time after the cancellation of the bond. Nora testified that he did not understand that his collateral would be retained after the effective cancellation date.

Nora ceased operations of his track buying business after his bond was canceled.

Between the notice and effective cancellation dates, he conducted no business and incurred no debts. He did make an attempt to acquire another bond, but was unsuccessful because of his lack of collateral. Nora's attempts to retrieve his collateral from Safeco between the end of November and the time that this suit was filed were also unsuccessful.

Nora filed this action on December 19, 1976 alleging Safeco had unlawfully retained the time certificate (his collateral) and that as a result of Safeco's action his credit standing had been damaged and he had lost customers and general business profits. Safeco answered denying it had unlawfully retained the collateral and set forth as an affirmative defense that it had been willing to release the collateral following the expiration of a reasonable time after the bond was canceled. The case went to trial and at the end of Nora's case Safeco moved for a directed verdict which the district court denied. After the conclusion of the trial, a jury awarded Nora a judgment in the amount of $52,000. The judgment was entered on August 12, 1976. Safeco thereafter moved in the alternative for a motion for remittitur, motion for judgment n. o. v., or motion for new trial. These motions were denied. Safeco is appealing the August 12 judgment.

Nora was allowed to testify at trial as to his projected volume of business and profit margins in the 1975–76 season had he been able to conduct his track buying business. Safeco objected to this testimony contending that it was speculative and lacking in foundation. Nora was also allowed to elicit testimony from Mr. Glen Capps, an experienced track buyer. Capps gave testimony indicating his volume of business and profit margins in previous years. Safeco objected to this testimony contending that it lacked proper foundation and that it allowed the jury to draw unfair comparisons between the business of Capps and of Nora. Safeco argued that the comparison was unfair because of the differences in business experience between Capps and Nora.

On appeal, Safeco assigns four errors by the district court which can be summarized as follows:

(1) The district court erred by receiving the testimony of Nora and Capps in the first instance and even with this testimony, there was insufficient evidence to sustain the damage claim and verdict; thus the district court erred by denying Safeco's motion for a directed verdict.

(2) The district court erred by refusing two of Safeco's proposed instructions concerning liability.

I

■ Safeco contends that it was error to allow Nora to testify concerning his projected volume of business and profit margins for the 1975–76 season because the testimony was speculative in nature and lacking in foundation. Nora gave testimony indicating his volume of business and profit margins in the 1974–75 season. Nora's testimony, substantiated by business records, indicated that he had moved 1,481 tons of hay and 7,800 cwt of grain in the 1974–75 season, grossing $122,681.69 in total sales with $104,488.30 in production costs. Thus Nora's net profit for the 1974–75 season was $18,193.39. Nora was then allowed to give an opinion as to the amount of business he expected to do and the amount of profit he expected to realize in 1975–76 had he been bonded and licensed as a track buyer. Nora's testimony indicated that he would have moved a total of 6,000 tons of hay and 2,500 tons of grain in 1975–76, for a net profit of $86,800. His projections of expected volumes of business and profit margins were based on his previous years experience and on his personal knowledge of the market. Nora's personal knowledge of the market was based on contacts he had made with buyers and sellers of hay and grain.

The district court properly allowed this evidence to be introduced. It was not too speculative to be inadmissible as proof of lost future earnings. Nora's testimony concerning his previous volume of business and profit margins was substantiated by busi-

ness records. His testimony concerning projected volumes of business was substantiated by some sixteen witnesses who were called to testify that they would have done business with Nora had he been able to conduct his track buying business. This testimony was also substantiated by the witness Glen Capps, who testified that the market trading of hay and grain was very active, indicating that ample commodities were available for trading. Nora's testimony concerning his projected profit margins for 1975–76 was substantiated in two ways. First, Nora's business records from the previous year showed the amount of profit Nora could have realized per ton of hay and grain moved. Second, the witness Glen Capps stated that Nora could expect a net profit of $70,500 if he moved the 6,000 tons of hay and 2,500 tons of grain in 1975–76. This Court has stated " * * * that in cases of 'tortious interference with an established business that damages for loss of anticipated earnings or profits must be shown with reasonable certainty.' [citations omitted] The purpose of the 'reasonable certainty' rule is to avoid making compensatory damages awards for lost profits which are fabricated or based on mere conjecture or speculation. [citations omitted]" *Jolley v. Puregro Co.*, 94 Idaho 702, 706, 496 P.2d 939, 943 (1972). The testimony elicited from Nora was not mere conjecture or speculation and as a consequence the admission of Nora's testimony did not violate the rule set forth in *Jolley*.

■ Safeco also contends that it was error to admit the testimony of Glen Capps, an experienced track buyer, concerning his volume of business and profit margins. The experience of other persons in the same or similar businesses was relevant evidence which could be considered by the court. *Speer v. Quinlan*, 96 Idaho 119, 525 P.2d 314 (1974). The fact that there were differences between Nora and Capps regarding their experience in the track buying business does not per se render Capps' testimony inadmissible. The question as to whether these differences were great enough to render Capps' testimony irrelevant and consequently inadmissible, is vested in the

sound discretion of the trial court. The trial court's determination will not be disturbed, absent a showing of abuse of discretion. *Cogswell v. C. C. Anderson Stores Co.*, 68 Idaho 205, 192 P.2d 383 (1948). The testimony of the witness Capps was competent for the purpose offered. Mr. Capps was engaged in the same business. His testimony, presumedly elicited to substantiate the testimony of Nora, was correctly admitted by the district court.

■ A motion for a directed verdict must be denied if all of the evidence, viewed in a light most favorable to the plaintiff, makes out a prima facie case. *Loving v. Freeman*, 93 Idaho 426, 462 P.2d 519 (1969); *Petersen v. Parry*, 92 Idaho 647, 448 P.2d 653 (1968). There was substantial and competent evidence before the court tending to establish Nora's case. The district court correctly denied Safeco's motion for a directed verdict.

II

■ Safeco contends that the district court committed error by refusing two proposed instructions regarding liability. Considering the instructions which were given and the fact that a special verdict form was used, we conclude that the trial court did not commit error by refusing to give these instructions. The jury was fairly apprised of Safeco's theory in the case and the appropriate rules of law. The instructions given by the district court adequately covered the issues involved. It is not error to refuse proposed instructions when other instructions have been given covering the issues in the case. *Meissner v. Smith*, 94 Idaho 563, 494 P.2d 567 (1972).

■ During oral arguments the question was raised as to whether the owner of property in an action based upon the theory of conversion can recover lost business profits. This Court has not addressed this specific issue before but several cases have impliedly stated that lost business profits are recoverable in such an action. In *Jolley v. Puregro Co., supra*, agents of the defendant, Puregro, converted a potato harvester

owned by Jolley. Damages for lost business profits were denied Jolley in this case because he failed to prove these damages with "reasonable certainty" in that he " * * * offered no competent evidence to support his estimate that his net profits would be 50% of his gross receipts." 94 Idaho 702, 707, 496 P.2d 939, 944. Implicit in this holding is that lost business profits could have been recovered had the profits been proved with reasonable certainty. Also, the cases *Weaver v. Pacific Finance Loans*, 94 Idaho 345, 487 P.2d 939 (1971) and *Duff v. Draper*, 98 Idaho 379, 565 P.2d 572 (1977) impliedly stand for the proposition that lost business profits are appropriate damages in a conversion case when proved with reasonable certainty. We are aware that it would not be proper to allow lost business profit damages in every case involving conversion. The damages would only be proper when the person whose property has been converted shows that the conversion has resulted in lost business profits and shows with reasonable certainty the amount of these lost profits. The award of lost business profits in this particular case was proper.

Both parties have requested attorney's fees on appeal. Neither party, however, has set forth any statutory basis for these attorney's fees. Therefore, the requests for attorney's fees are denied.

The decision of the district court is affirmed. Costs to respondent.

SHEPARD, C. J., and BISTLINE, J., concur.

McFADDEN, Justice, dissenting.

I dissent from the majority opinion in several respects. First, it is my conclusion that no award for lost profits or other consequential damages should be allowed in this case. Even if such damages are allowable, however, the majority is remiss in not enunciating standards for which consequential damages are compensable. Finally, I would hold that Nora failed to show lost future profits with reasonable certainty.

### I

I do not concur in the majority's characterization of this suit as a conversion action. While Nora's complaint alleges Safeco's "unlawful retention" of the savings certificate, Nora did not ask for its specific return.[1] Nor did Nora specifically ask for the value of the certificate as of the time Safeco's retention of it became unlawful. Rather Nora alleged that he and Safeco had an "understanding" that the certificate would be returned when the bond was cancelled and that Safeco did not do so. For this Nora asked for general "damages in the sum of $200,000.00." Furthermore, Safeco's answer alleged that the certificate was held with Nora's "consent and permission" and denied any claim to the certificate. The answer, which was filed only ten weeks after the bond was cancelled, also offered to turn the certificate over to the court "to be paid to plaintiff." Several weeks later and several months before trial the certificate was given to Nora's counsel pursuant to a stipulation. After considering all these circumstances, I conclude that the action as tried sounds more in contract than conversion.

Damages recoverable in a contract action are limited by the rule of *Hadley v. Baxendale*, 9 Exch. 341, 156 Eng.Rep. 145 (1854). Although this court has not expressly adopted *Hadley*, in *Lockwood Graders of Idaho, Inc. v. Neibaur*, 80 Idaho 123, 326 P.2d 675 (1958), we adopted its functional equivalent. Quoting Sutherland on Damages, this court held:

> In an action founded upon a contract only such damages can be recovered as are the natural and proximate consequences of its breach; such as the law supposes the parties to it would have apprehended as following from its violation if at the time they made it they had bestowed proper attention upon the subject and had full knowledge of all the

---

1. Had Nora wished the immediate return of the certificate, he would have filed a claim and delivery action pursuant to I.C. § 8–301 et seq., which replaces the common law replevin action in Idaho. *National Motor Service Co. v. Walters*, 85 Idaho 349, 379 P.2d 643 (1963).

facts. As otherwise expressed, the damages which are recoverable must be incidental to the contract and caused by its breach; such as may reasonably be supposed to have been in the contemplation of the parties at the time the contract was entered into. Direct damages are always recoverable, and consequential losses must be compensated if it can be determined that the parties contracted with them in view.

1 Berryman, Sutherland on Damages, § 45 at 170 (4th ed. 1916), as quoted in *Lockwood Graders of Idaho v. Neibaur, supra*, 80 Idaho at 127–128, 326 P.2d at 677.

In the instant case I would hold that the jury should have been asked to determine whether Safeco held Nora's time certificate beyond the time agreed for its return and that, if it did, the jury should determine and award the value of the savings certificate's lost use for that period of time, which is discussed below. I would also hold that the jury should have been asked whether other consequences, such as Nora's lost business opportunities, were contemplated by the parties as results of a breach; if they were, the jury should have been instructed to award damages for these consequences in addition to the lost use value of the certificate. *E. g. Olson v. Quality-Pak Co.*, 93 Idaho 607, 469 P.2d 45 (1970) (loss due to frost damage to potatoes held within contemplation of parties to a contract providing for construction of potato cellar).

## II

Even if Nora's action can be characterized as a conversion action, the amount of damages he might recover should not be significantly different. The reason lies in the public policy embodied in the rules limiting which damages may be recovered in the common law actions of trover, replevin and detinue.

In the classical trover action (conversion), the plaintiff seeks a forced sale of an item of personalty to the defendant who has wrongfully taken or detained it. His damages are limited to the value of the item at the time of conversion plus interest. 3

Blackstone Comm. 153 (21st ed. 1844); 4 Sutherland on Damages, *supra*, § 1109 at 4209. In suits in the nature of replevin and detinue, such as Idaho's claim and delivery action (I.C. §§ 8–301 et seq.), the plaintiff obtains the return of the specific item taken or detained and compensation for lost use while the item was in the defendant's hands. Under the common law, special consequential damages are not compensable in any of these actions.

In *Michael v. Zehm*, 74 Idaho 442, 263 P.2d 990 (1953), this court stated that, "Generally the successful party may recover such damages in claim and delivery action as will compensate him for the loss he has sustained, if any, by being wrongfully deprived of the possession of the property." 74 Idaho at 445, 263 P.2d at 991. In *Zehm* we did not discuss the *measure* of damages, however, because we found the prevailing party not entitled to any damages. In *National Motor Service Co. v. Walters*, 85 Idaho 349, 379 P.2d 643 (1963), this court instructed a lower court as to the measure of damages in such an action. This court stated:

A recognized measure of damages for the wrongful taking or detention of personal property is the reasonable value of its use during the period of detention. [Citations omitted.] If the owner retakes the converted property, damages recoverable by the owner are based on the value at the time of the conversion, but in mitigation, the wrongdoer is entitled to credit for the value of the property at the time of return, though he is chargeable with the value of its use, of which the owner has been deprived, during the period of wrongful detention.

85 Idaho at 360–61, 379 P.2d at 651.

As a measure of lost use, the successful party in a claim and delivery action is entitled to interest on the value of the detained article:

"Ordinarily, unless the property in suit has a usable value, and the damages may be estimated on that basis, the prevailing party in replevin will be awarded interest on the value of the property during the

time of the wrongful detention. * * " This is a well established general rule. *Warren v. Griffing*, 200 Okl. 108, 190 P.2d 1014, 1016 (1948); 77 C.J.S. *Replevin* § 276 (1952). The court in *Warren* went on to determine that jewelry, which had been successfully replevied by an estate administrator from one claiming the jewelry as a gift, had no "usable value" and that, therefore, the administrator was entitled to interest on the jewelry's value. The same court, in an earlier case, *Thomas v. First National Bank of Tecumseh*, 32 Okl. 115, 121 P. 272 (1912), stated:

> One of the exceptions to the general rule, as to the measure of damage, for the wrongful taking and conversion of personal property, is where the property so taken has a distinct 'usable value'; and horses, broken and trained to do work, would have, under ordinary circumstances, such 'usable value,' and where such property has been wrongfully taken by one, and detained from another, such other has the right to recover as damages the reasonable value of the use of such property during the period of its wrongful detention; and this value is ordinarily to be determined by the ordinary market price of the use of such property at the place of taking during the period of the detention.

121 P. at 272. The same rule was announced in *Gregory v. Padilla*, 379 P.2d 951 (Alaska 1963), in which the Supreme Court of Alaska approved the following jury instruction:

> Where the property has a value for use, or usable value, which exceeds the amount represented by the lawful rate of interest, or where the interest would be inadequate compensation, the prevailing party is entitled . . . to the usable value of the property, estimated by the ordinary market price of the use of such property, even though such usable value exceeds the value of the property and

such usable value will constitute the measure of damages.

379 P.2d at 956.

The use value in the marketplace of some items is measured by the earnings that they bring their owner, if such can be established with reasonable certainty. The classic example is "tools of the trade." Thus a carpenter can recover lost earnings (or, as it is sometimes referred to, "lost profits") for the detention of his tools. *Bodley v. Reynolds*, 8 Q.B. 779, 115 Eng.Rep. 1066 (1846). A similar example is *Steel Motor Service, Inc. v. Zalke*, 212 F.2d 856 (6th Cir. 1954) (applying Michigan law). In that case a "freelance" trucker who owned a single tractor and trailer left the trailer at a terminal to be unloaded. The trailer was never returned to the trucker and, after several months of vain efforts to do business with only the tractor, the trucker was forced to sell the tractor for considerably less than its fair market value. The court affirmed the district court's finding that the trailer was a "tool of his trade" and that "the difference between [the trucker's] earnings with his trade equipment and without . . . was a measure of the value of the use of the equipment." 212 F.2d at 859. The court also compensated the trucker for his loss on the forced sale of his tractor.

Our case of *Weaver v. Pacific Finance Loans*, 94 Idaho 345, 487 P.2d 939 (1971), cited by the majority,[2] is another good example. In that case (in dicta) we said that where a defendant unlawfully removes from plaintiff's tavern his liquor license, the physical presence of which is necessary to do business, the plaintiff may recover lost profits. Certainly few items are as much a "tool of the trade" to a tavern owner as his liquor license. Thus it was reasonable to allow his lost profit as a measure of the lost use of the license.

In the instant case Nora does not seek "lost profits" for the detention of a tool of the trade. Had Safeco detained Nora's trucks, his chauffeur's license or his Idaho

---

**2.** The majority also cites *Duff v. Draper*, 98 Idaho 379, 565 P.2d 572 (1977), in which the issue of whether consequential damages can be recovered in a conversion action was not directly discussed by the court.

Public Utilities Commission permit, the result would be different. Secondly, Nora does not seek "lost profits" as the value of the savings certificate's lost use. The "lost use value" of the certificate is plainly the interest paid on the certificate, which Nora continued to receive during the entire time in question. Rather Nora seeks "lost profits" in the sense of lost business opportunities and harm to his business and credit reputation. These are not "lost profits" in the sense of lost use but in the sense of special consequential damages. Thus the majority does a sleight of hand when it simply says that "The award of lost business profits in this particular case was proper." The majority also ignores this court's statement in *National Motor Service*, which I would hold controls this case:

> If the owner retakes the converted property, damages recoverable by the owner are based on the value at the time of the conversion, but in mitigation, the wrongdoer is entitled to credit for the value of the property at the time of return, though he is chargeable with the value of its use, of which the owner has been deprived, during the period of wrongful detention.

85 Idaho at 361, 379 P.2d at 651.

Once this court overrules *National Motor Service* and its statement of the common law rule and decides that lost profits and other special consequential damages are compensable in conversion and replevin actions, it must specify which consequential damages are sufficiently closely connected to the deprivation to be compensable. In every civil action where compensatory damages are awarded, some limitation is placed on the harms to be compensated. For example, a plaintiff in an action to recover a debt recovers only the amount of the debt plus interest, *Wallace Bank & Trust Co. v. First National Bank of Fairfield*, 40 Idaho 712, 237 P. 284 (1925); *Steel v. Eagle*, 207 Kan. 146, 483 P.2d 1063 (1971); *Monarch Refineries, Inc. v. Union Tank Car Co.*, 193 Okl. 110, 141 P.2d 556 (1943) (quasi-contract), even though the defendant's nonpayment has caused the destruction of plaintiff's entire business. Similarly, the plaintiff in a breach of contract action recovers only the benefit of the bargain, even though the breach actually causes greater loss. *E. g., McOmber v. Nuckols*, 82 Idaho 280, 353 P.2d 398 (1960) (Damages for breach of service contract equal the cost of securing performance by other means). The rule of *Lockwood Graders, supra*, prevents unforeseeable consequential damages from being compensable. The plaintiff in a negligence action likewise may not be compensated for all actual loss, although the concept of proximate cause certainly allows compensation for more indirect losses than would be compensated in a breach of contract action.[3] In intentional tort actions a plaintiff can recover even more extensive kinds of damages, including punitive damages. In all of these cases the civil law has made policy judgments as to the extent to which actual losses should be compensated.

The traditional actions of conversion and replevin represented policy judgments that special consequential damages should not be compensated. If this court is to change that rule, it must also establish guidelines as to the kind of consequential damages that will be compensated. Among the jurisdictions that do allow consequential damages in conversion actions, the rules are chaotic.[4]

3. "The modern rule in tort is quite different and it imposes a much wider liability [than the rule in contract actions]. The defendant will be liable for any type of damage which is reasonably foreseeable as liable to happen even in the most unusual case, unless the risk is so small that a reasonable man would in the whole circumstances feel justified in neglecting it; and there is good reason for the difference. In contract, if one party wishes to protect himself against a risk which to the other party would appear unusual, he can direct the other party's attention to it . . .. In tort, however, there is no opportunity for the injured party to protect himself in that way, and the tortfeasor cannot reasonably complain if he has to pay for some very unusual but nevertheless foreseeable damage . . .." *Koufos v. C. Czarnikow Ltd. (The Heron II)*, [1967] 3 W.L.R. 1491, 3 All.E.R. 686, 691–2 (H.L.) (Lord Reid).

4. Some cases have not stated the limits on compensable damages. The Restatement (Second) of Torts states that the deprivation

I think the reason for the divergence in the cases lies in the fact that, although labeled a tort, conversion encompasses conduct remedial by actions sounding in tort, contract, debt and even strict liability. For example, each of the following is a converter: (1) a felon who steals personalty; (2) a bona fide purchaser of stolen goods; (3) a bailee who breaches his bailment contract by failing to return bailed goods; and (4) a pledgee who retains a treasury bond in violation of his pledge agreement. My point is this: it will not do to decide which consequential damages a thief will be liable for and apply the same rule to a bailee or pledgee. The only thing worse would be to make no rule at all.

The instant case presents the same problem. As previously noted, although this suit has been labeled a conversion action, it sounds more in contract for breach of a pledge agreement or for collection of a debt. Yet the majority has not explained why, in a conversion action for a $10,000 savings certificate, a plaintiff should be compensated for lost business opportunities, while in an action on a $10,000 debt he should not. The practical result is to make Safeco pay as if it were a thief when its

conduct more resembles that of a nonpaying debtor.

### III

I also dissent from the majority's holding that Nora showed lost future profits with reasonable certainty. "This court has explicitly stated that damages for loss of earnings or profits must be shown with reasonable certainty and that compensatory awards based upon speculation or conjecture will not be allowed." *Rindlisbaker v. Wilson*, 95 Idaho 752, 761, 519 P.2d 421, 430 (1974); *Jolley v. Puregro Co.*, 94 Idaho 702, 496 P.2d 939 (1972); *McLean v. City of Spirit Lake*, 91 Idaho 779, 430 P.2d 670 (1967); *Belts v. State ex rel. Dept. of Highways*, 86 Idaho 544, 388 P.2d 982 (1964); *McOmber v. Nuckols, supra*; *Coast Transport, Inc. v. Stone*, 79 Idaho 257, 313 P.2d 1073 (1957); *Huggins v. Green Top Dairy Farms, Inc.*, 75 Idaho 436, 273 P.2d 399 (1954). I would hold that much of Nora's testimony was speculative and conjectural and that the testimony of Glen Capps should not have been allowed because his business was significantly different from Nora's.

must be the "legal cause" of the harm. Restatement (Second) of Torts § 927 (Tent.Draft No. 19, 1973). In *Preble v. Hanna*, 117 Or. 306, 244 P. 75 (1926), the Oregon Supreme Court stated that the damages must "naturally flow from the tortious act." 244 P. at 78. On the other hand, some jurisdictions have limited special damages by adopting a rule analogous to *Hadley v. Baxendale*. The Washington Supreme Court, in *Cannon v. Oregon Moline Plow Co.*, 115 Wash. 273, 197 P. 39 (1921), denied recovery for lost profits to a farmer plaintiff whose tractor had been converted by the tractor's seller. The farmer had been unable to plant his crop as a result. The court said:

The damages demanded in this case do not come under the head of the ordinary, usual, or commonly to be expected consequence of such tort. They must, then, be brought within the head of unusual and peculiar consequences of the wrongdoer's act, if, under the circumstances, it can be fairly said that both parties have these consequences in contemplation at the time of the wrong complained of, as the probable result thereof, and if these unusual consequences are neither uncertain, unnatural, nor remote as to cause, nor speculative and conjectural in effect.

197 P. at 41. Similar facts and the same theory lead to a different result in a more recent Colorado case. In *Colorado Kenworth Corp. v. Whitworth*, 144 Colo. 541, 357 P.2d 626 (1960), plaintiff trucker sued the seller of his truck-tractor for wrongfully repossessing it. The court stated:

Are consequential damages recoverable in a conversion action, or is the plaintiff restricted to a recovery of the value of the article taken with interest on such value? Any answer to this question must take into consideration that we are dealing with a commodity purchased for a purpose: hauling freight; this was in the contemplation of the contracting parties. Although the suit is in tort, Kenworth should be answerable to such damages as will completely indemnify Whitworth for the natural and probable consequences of its conversion.

357 P.2d at 631. The seminal case for this rationale appears to be *Bodley v. Reynolds*, 8 Q.B. 779, 115 Eng.Rep. 1066 (1846). *See also, Barrington v. Offenbach*, Sup., 163 N.Y.S. 423 (1917); McCormick on Damages, § 123 at 466 (1935).

Nora testified that in the 1974–75 season he moved 1481 tons of hay and that the next season he would have hauled four times that amount. Nora had never hauled hay to either California or Nevada and could name no buyers in those states, yet he was allowed to testify that the next year he would have entered those markets and sold twice as much hay there as he had hauled to all his customers in 1974–75. Nora said he expected to develop in Nevada a bigger market during his first year there than he had developed in his home state during 1974–75, his first year in business. Nora admitted on cross-examination, however, that he didn't know what he would pay drivers going to California and Nevada and that he had made no investigation into trading or trucking regulations in those states.

As for his home state hay market, Nora estimated that, based on his knowledge of the market, he would have doubled his sales in 1975–76.

Nora also testified that in 1974–75 he had hauled 390 tons of wheat. He estimated that the following season he would have hauled more than *six times* that amount: 2500 tons. Again Nora could name no certain buyers but based this estimate on his experience in the business and the contacts he had developed. While the majority correctly states that Nora produced sixteen favorable witnesses who said they had and would continue to conduct business with Nora, the majority does not point out that all sixteen were from Twin Falls or Jerome counties. Thus I would hold that much of Nora's testimony was too speculative to be the basis of an award.

Furthermore, I would hold that the testimony of witness Capps was irrelevant and therefore should not have been admitted. In my opinion, the record shows that Capps' business was substantially different from Nora's. Capps testified that his stepfather was a trackbuyer, that he started working for his stepfather in 1948, that he had been buying and selling since 1950 and that he had run the business on his own since his stepfather's death in 1965. Nora, on the other hand, had been buying and selling about a year and was properly bonded and licensed for only two months, during which time he transacted no business whatever. Nora further testified that he was unaware of any bonding and licensing requirements until he received a letter from the Idaho Department of Agriculture ordering him to comply with their regulations.

As for Nevada sales, Capps testified that his market there had been developed over a 20-year period and was never steady. Yet Nora, with no experience in the Nevada market, was allowed to state his estimated sales there.

Capps was also permitted to testify to his business profits, apparently so that the jury could establish Nora's prospective earnings. Yet Capps himself admitted that his profits history bore no relation to Nora's potential profits:

Q Do you know whether or not this experience of yours as far as profit and margin between purchase and sale price is typical among track buyers in this area?

A No, I couldn't answer that because I am not aware of what their costs are or how they operate or prices. We generally get our own prices, and our own expenses and so forth. It's each individual's business, so I can't answer your question there.

In light of the differences between Nora's and Capps' businesses and Capps' own statements comparing the profitability of the two businesses, I would hold that Capps' testimony should not have been admitted. With or without this testimony, I would also hold that Nora's estimates of his 1975–76 business, particularly in Nevada and California, were too speculative to be used as the basis for an award of lost profits.

For these reasons I dissent from the majority opinion.

BAKES, J., concurs.