[No. 38954. Department Two. December 14, 1967.]

GUARANTY NATIONAL INSURANCE Co., *Respondent,* v. VINCENT MIHALOVICH *et al., Appellants.*\*

\*Reported in 435 P.2d 648.

*Charles R. Johnson* (of *Gordon, Honeywell, Malanca, Peterson & Johnson*), for appellants.

*Carson F. Eller* (of *Johnson, Griffin, Boyle & Enslow*), for respondent.

HILL, J.—Guaranty National Insurance Company, a corporation (hereinafter referred to as Guaranty), which carried the insurance on cars owned by Acoma Car Rental, Incorporated (hereinafter referred to as Acoma), sought by a declaratory judgment action to be relieved of its liability on its policy with Acoma for damages occasioned to Mr. and Mrs. Vincent Mihalovich when the car in which they were driving was involved in a collision (November 16, 1963) with an Acoma car, which had been rented to Gary Harris (October 15, 1963) and was being driven by him.

Guaranty made Mr. and Mrs. Gary Harris and Mr. and Mrs. Vincent Mihalovich parties to the action. The latter joined their insurance carrier, State Farm Mutual Automobile Insurance Company, a corporation (hereinafter referred to as State), as a third-party defendant. It is conceded that if Guaranty is not liable under its policy with Acoma for the damages sustained by the Mihaloviches, State is liable by virtue of the "uninsured motorist's" provision[1] in its policy issued to them.

Guaranty's disclaimer of liability is predicated on its contention that Gary Harris had converted the car to his own

---

[1] State's counsel stipulated "that if there is not insurance here [under Guaranty's policy], there is under the uninsured motorist's"; and again, "We have no defense on the uninsured motorist coverage other than the fact that there is other insurance."

use and was no longer renting the car,[2] but if its coverage was in effect that Mr. Harris had failed to notify and cooperate with Guaranty in the suit brought by the Mihaloviches.

The trial court concluded that after renting the car Gary Harris had converted it to his own use; that he was not a renter at the time of the collision, and, hence, not covered by the Guaranty-Acoma policy.

Judgment was entered to that effect and State and the Mihaloviches each appeal.

On each appeal the issue is the same: Whether the Acoma car driven by Gary Harris, which collided with the Mihalovich car, had been, at the time of that collision, converted by Gary Harris to his own use.

Peculiarly, neither of the parties from whose attitudes and actions that issue must be determined (Acoma and Gary Harris) is a party to this appeal.

The trial court's conclusion that there had been a conversion seemingly rests on the basis that the car, rented for 1 day on October 15, 1963, was still in the possession of Harris on November 16, 1963. Retention of a chattel by a bailee beyond the period for which it was bailed does not, in itself, constitute a conversion. It is our view that the attitudes and the acts of lessor and lessee in the interim do not support such a conclusion in this case.

The Acoma car was rented to Mr. and Mrs. Harris, who were both present in the Acoma office, on October 15, 1963. A deposit of $25 was made by Mr. Harris, who signed the

---

[2]The insurance policy contains the following language:

"It is further agreed that such insurance as is afforded by this policy is extended to a 'renter' as defined, but subject always to the terms, conditions, and limitations of the policy. The limit of the company's liability as respects the renter is:

"Coverage 'A'—Bodily injury liability.....$10,000.00 each person
$20,000.00 each accident

"Coverage 'B'—Property damage liability...$10,000.00 each accident

"Definitions:

"1. The term 'renter' as used herein means:

"A. Any person, firm, association, partnership or corporation to whom an automobile has been rented (herein referred to as the 'renter');"

rental agreement. Mrs. Lois O'Brien, the office manager for Acoma, said the car was to be returned the next day, as written in the appropriate blank in the rental agreement. Mr. Harris testified that it was rented for a week, and that the rental agreement was not filled in when he signed it.

There is a further conflict in the testimony as to the communications between Acoma and Mr. and Mrs. Harris following the rental. Harris testified that he secured the car to take his wife on a trip around the Olympic peninsula, in an effort to patch up their matrimonial difficulties. He testified that 3 days after renting the car and while on the Olympic loop trip, his wife desired to have the lease extended for a month so that they could visit her parents, and that she called Acoma in his presence to request an extension of the rental period to a month, which extension she told him was granted. He testified further that after they had returned to Tacoma he and his wife both talked with a representative of Acoma by telephone, and the 1 month rental period was confirmed.

The trial court was, of course, free to disregard the testimony of Mr. Harris and to believe the testimony of Mrs. O'Brien. However, her testimony and her actions both negate any intention on the part of Acoma to regard the retention of Acoma's car as a theft, embezzlement, or conversion. While she denies having any telephone conversation with Mr. Harris, she admits having been in communication with Mrs. Harris. We quote her testimony.

Q. Did you talk with Mrs. Harris personally? A. Yes, I did. Q. And how many times, do you remember? A. No, I don't, offhand. Q. Was it more than once? A. No, I don't believe it was more than once.

A letter (exhibit No. 3) from Mrs. Harris to Acoma, produced by Mrs. O'Brien, certainly indicates much more extensive communication than Mrs. O'Brien concedes. She admitted, too, that she knew that Mrs. Harris had been involved in an accident with the car, which antedated the October 16 collision with the Mihalovich car, and that Acoma had received at least two letters from Mrs. Harris. Mrs. O'Brien testified as follows:

Mr. Eller: These three pages [referring to exhibit No. 3] make up one letter. The witness: I would have to read it. I would say yes, this is—no, this is the second letter when she sent the insurance form back. Q. The last page is part of the second letter? A. Yes. Wait a minute, I would have to; really have to have my original. Mr. Cavanagh: Just so I understand it, it is one letter? The witness: That is all one, that's right.

She explained a failure to turn the matter over to the police, "because Mr. Harris' father stepped in and asked us not to." She also referred to there having been a "lot of promises." Promises are, of course, made to somebody by somebody and involve communication.

None of this sounds like Acoma was contending that Gary Harris had stolen its car or had converted it to his own use. And, certainly, its computation of the charges against him amounting to $1,059.44,[3] as shown on exhibit No. 1, are much more consistent with a claim of lease (bailment) than of conversion.

We note, too, the quickness and the ease with which Acoma acquired possession of its car after the collision with the Mihalovich car. Mrs. O'Brien saw the car very shortly after the collision. It was in drivable condition, and she testified, "Someone from our company drove it to the

---

[3]Computed as follows:

| | | |
|---|---:|---|
| 52 days at $9 a day | $ 468.00 | |
| 2,142 miles at 9¢ a mile | 192.78 | |
| | 665.78 | [their addition; ours, $660.78] |
| Damage | 356.53 | |
| Towing | 10.50 | |
| | 1,032.81 | |
| Tax | 26.63 | |
| | $1,059.44 | |

52 days is apparently computed as the elapsed time between the day the car was rented October 15, and the day it was "returned" to Acoma, i.e. December 6. Acoma actually took possession of the car on November 16, following the collision with the Mihalovich car, and took it to a garage for repairs. December 6 is apparently the date Acoma has decided to say that the car was returned to service.

garage,".[4] Any question of notice to Acoma that its car had been involved in a collision would seem superfluous in the light of this testimony.

As indicated, the trial court, seemingly on no other basis than the length of time that Mr. Harris had retained possession of the rented car, concluded that there had been a conversion.

■ Such a conclusion is a non sequitur. Possession for a month under a claim of lease certainly does not support that conclusion. Assuming the truth of Mrs. O'Brien's statement that the lease was for 1 day and that there was no extension, it still does not follow that the retention by a bailee of a car beyond the period for which it was bailed constitutes a conversion. He may be liable for a breach of his contract and not guilty of conversion or of any other tort. Salmond on the Law of Torts, § 78, p. 310 (9th ed. 1936). The following is an amplification of the foregoing statement:

> [D]etention of a chattel amounts to a conversion only when it is adverse to the owner or other person entitled to possession—that is to say, the defendant must have shown an intention to keep the thing in defiance of the plaintiff. . . . Thus, if a bailee merely holds over after the end of the period for which the chattel was bailed to him, he may be liable for a breach of contract, but he is not guilty of conversion or of any other tort. He has not deprived the owner of the possession, for there is nothing to show that the plaintiff may not have the chattel again whenever he desires it. (p. 315)

There is no evidence that the Harrises ever claimed possession of the car in question as anything but a lessee from Acoma, and no evidence that Acoma was anything but a reluctant lessor.

It is important to keep in mind who is claiming that there has been a conversion in this case and who assumes

---

[4]This would seem to raise some question about the towing charge indicated in footnote 3, unless it had reference to the prior accident in which Mrs. Harris had been involved and of which Guaranty or some insurance company obviously had notice. See reference to "insurance form" in the quoted testimony of Mrs. O'Brien, page 702 of this opinion.

the burden of proving it. It is not Acoma which was much better off keeping this transaction on a bailment basis and recovering its car rental and repair bills from the Harrises, rather than suing for the value of the vehicle under trover for conversion, which normally effects a transfer of the chattel to the converter. As we point out in *Martin v. Sikes*, 38 Wn.2d 274, 287, 229 P.2d 546 (1951),

A judgment for conversion has normally no other consequence than to compel the defendant to buy the converted goods at what is in reality a forced sale.

For whatever reason, Acoma did not choose to call it a theft and enlist police aid in recovering a stolen car; nor did it suggest conversion.

It was only after Acoma had regained possession of its car (after the collision with the Mihalovich car), that Guaranty, Acoma's insurance carrier—to escape its liability as an insurer—sought some basis for claiming that Gary Harris was not a renter of the car at the time of the collision with the Mihalovich car. If he was not a renter, what was he? Guaranty chose the label of "conversion" to mark the termination of the bailment or lease. To establish that Harris was a thief or an embezzler of the car would require proof of intent; and, of course, when those words are used, libel and slander present an ever present danger. But proof of intent is not necessary in establishing a conversion. *Judkins v. Sadler-Mac Neil*, 61 Wn.2d 1, 376 P.2d 837 (1962).

But it is still necessary, in order to transform a bailment into a conversion, that the bailee has, in some way, decisively indicated a repudiation of the right of the owner to the car.

The refusal of a demand to surrender possession is a customary way of proving conversion, because it establishes a moment at which the bailment or other relationship terminated and a conversion occurred. Concededly, there are other ways in which a conversion can be established, but it is not easy. As Dean Prosser says in his article "The Nature of Conversion," 42 Cornell L.Q., 168 at 184:

In part quite deliberately, and in part as the result of unexpressed and more or less instinctive agreement, the courts have limited it to those interferences [with the plaintiff's rights] which are so important and serious as to justify the drastic remedy.

We are satisfied that, disregarding entirely the testimony of Gary Harris, there has been no conversion established.

■ We have not overlooked the provision on the back of the rental provision (though we were able to find it only by the use of a magnifying glass).[5]

Lessee agrees that if he does not return the vehicle as herein provided or if information given by Lessee be deemed false it shall constitute probable cause for belief by Lessor that the vehicle has been stolen and cause for the institution of such criminal or civil action as Lessor may elect, such action may include but is not limited to the issuance of one or more warrants for the arrest of Lessee. (subsection (a) of § 2 of the rental agreement)

The language of this subsection does not support the construction that failure to promptly return the rented vehicle, ipso facto, constitutes conversion by the lessee. Use of the words "shall constitute probable cause for belief," rather than language to the effect that failure to return "shall constitute theft and conversion," indicates that such belief by the lessor is permissive rather than mandatory, permitting the rental agency to regard the retention as a conversion and take such actions as it "may elect."

The purpose of this language, no doubt, is to serve notice upon the lessee that his possession beyond the agreed period may result in the lessor treating the car as converted. We do not, however, think that such equivocal language would have been utilized had it been intended that failure to return the car would automatically and conclusively be regarded as theft or conversion.

---

[5]While we have discussed the quoted provision of the rental agreement, we would express as a caveat that we would be loath indeed to charge anyone with notice of the content of provisions in a contract so extensive and written in such "microtype," if we may coin a word, as was this rental agreement. People signing car rental agreements such as this will not take the time to read such contract provisions, nor will

712

## Guaranty's second string to its bow—a claimed failure by the Harrises to cooperate by giving notice of the action

they possess the necessary magnifying glass. We reproduce it so that our meaning may be clear.

**Page 2**

**RENTAL AGREEMENT**

THE NATIONAL CAR RENTAL SYSTEM. Lessee named on Trip Ticket, as Lessor, hereby leases to Lessor the vehicle described on the following terms, covenants and conditions:

1. Lessee acknowledges that said vehicle is the property of Lessor, and that Lessee has received it in good physical and mechanical condition unless otherwise noted in this contract.

2. Lessee agrees to return said vehicle to Lessor with the same equipment and accessories to the premises from which rented or delivered to Lessor on the return date stated thereon or upon demand of Lessor. In the event any equipment or accessories are missing, stolen or damaged, Lessee agrees to pay the reasonable value thereof. If said vehicle is not returned to Lessor at the termination of the rental period specified on the trip ticket, Lessee shall be liable to Lessor and hereunder to deprive Lessor of the use of said vehicle, and in addition shall pay for said vehicle the same rate provided with all expenses incurred in retaking possession thereof. In the event the operator shall have been dispossessed or tampered with, Lessee agrees to pay an additional rental to that specified of $40 a mile per day at the mileage rate stated on this contract.

a) Lessee agrees that if he does not return the vehicle as herein-provided or if information given by Lessor the deemed false or shall constitute probable cause for belief by Lessor that the vehicle has been stolen and cause for the institution of such criminal or civil action, such action may follow; but is not limited to the issuance of one or more warrants for the arrest of Lessee.

b) In the event that the leased vehicle is not returned on the day indicated, then the lessee authorizes the lessor to make such offer of reward as he think necessary for his return and for the conviction of any one including the lessee involved in any suspected criminal act in regard thereto and to circulate such offers to no extent and in a manner which the lessor may desire.

c) Lessee hereby waives all rights and remedies against Lessor and releases Lessor from all claims, demands or causes of action for damages or otherwise arising out of any civil or criminal action instituted by Lessor.

3. Lessee agrees to inform Lessor of any violation for traffic violations issued on the vehicle during the period of the rental and to pay all resulting fine. The Lessee is in sole control of the vehicle and is responsible for compliance with the rules governing its operation.

4. The Lessee agrees to immediately report in writing, to the Lessor the happening of any accident, or loss, together with a true and full report on a said accident, its cause, the names and addresses of the parties involved and names of the witnesses thereto, and Lessee agrees to fully assist and cooperate with Lessor or its agents, in the investigation of any loss or accident and the preparation of any defense therefore, and Lessee agrees to deliver to the Lessor any summons or process which may be served upon or delivered to Lessee in connection therewith. In the event any claim is made or suit is filed either against Lessor or Lessee, or both, then Lessee shall have the exclusive right to direct the defense of said action, to make any compromise or settlement thereof. Lessee agrees to hold Lessor harmless from any liability or cost arising from the use of said vehicle resulting in property damage or personal injury to third parties, irrespective of the culpability or negligence of the parties involved.

5.

a) The lessee agrees to pay the lessor on demand a sum equal to the cost of all damages to the leased vehicle that was damaged as such sum which was urged during the term of the agreement, provided, however, that if the lessee is satisfied that such damage was not the result of the lessee's negligence, violation of law or breach of this contract, or if the lessee's liability therefore shall be limited to the amount stipulated on the trip ticket, and into the stated rental for each day that said vehicle is unable to be used by reason of the damage thereto. However, such limitation shall

be inoperative if the lessee fails to pay the total rental charge, including any collision protection charges that may be applicable.

b) If, in the opinion of the lessor, the collision damage to the leased vehicle is the result of the lessee's negligence, violation of law, or breach of this rental agreement, then the lessee shall pay to the lessor, without limitation, a sum equal to the total cost of repairs, loss of use, towing and storage charges.

c) Such collision protection as is hereby afforded shall be excess protection over any other valid and collectible collision insurance available to the lessee, either as an insured under a policy applicable with respect to the leased vehicle or otherwise.

d) Fire and Theft Insurance: The lessor agrees to provide fire and theft insurance coverage for the leased vehicle with no additional charge to the lessee. Such insurance protection, however, shall be null and void if the lessee fails to return the vehicle to the lessor.

6. The Lessee shall keep said property free from all liens, taxes, encumbrances, fines and any otherwise, in lieu of for any person or body, both civil and political, and if said vehicle become the subject matter of such levies, he hereby set out, the Lessee hereby agrees to pay to the Lessor, upon demand, the amounts so levied, and all sums of money incurred by the Lessor in recovering possession of the vehicle herein in the recovering thereof or to enable Lessor to give a clear title to said vehicle devoid of said levies, including costs, collection charges and attorneys fees.

7. Lessor may cancel this agreement without notice to Lessee and take possession of said vehicle if Lessee breaches any misappropriation to Lessor, or if there is at any time any breach of any term or condition of this agreement. Lessor agrees in said event to deliver up the possession of said vehicle upon demand to Lessor, and Lessor shall have the right to size, with or without legal process, and without notice to the Lessee, and with force if necessary, said vehicle at any time or place and shall not be liable to Lessee in any manner for so doing, and the Lessee waives all claims for damages due to or arising from, or connected with any such taking.

8. Any deposit given by Lessee shall be applied to guarantee the faithful performance of all of the provisions of this agreement, and for all sums which now or hereinafter may be due hereunder, and for all repairs necessary to said vehicle. If any action is brought to enforce any of the terms or conditions of this agreement, or to recover any sum due hereunder, Lessee agrees to pay a reasonable attorney's fee therefore, which in no case shall be less than Fifty Dollars.

9. The return of the deposit, minus all charges, to the Lessee shall not be a waiver of any of the rights of the Lessor to any of the provisions and conditions of this agreement to be kept and performed by Lessee.

10. Lessee expressly agrees as additional consideration for the use of said vehicle, not to:

A. Take it out of the State where rented, without written permission of Lessor.
B. Permit any other person to operate or use it.
C. Transport any merchandise or goods in it for hire or to carry liquor or narcotics.
D. Permit any other person to operate or use it.
E. Park or use it in violation of any law, and to keep it locked when unoccupied.
F. Operate it except in a careful and prudent manner.
G. Use it for any unlawful purpose, or for racing.
H. Disconnect or tamper with the speedometer, or push any other object.

11. The Lessor agrees to provide public liability and property damage insurance in the limits to liability stated on the trip ticket. If in the limits are stated on the trip ticket, no public liability and property damage insurance is provided by the lessor. If no limit—as noted, a violation of the rental agreement by the lessee, this agreement is provided by the lessor, any insurance, is null and void.

Any public liability and property damage insurance provided by the lessor is not applicable to truck-tractors, trailers, or any combination thereof, nor to a vehicle used for any type of group ride.

12. The instruments and limitation contains the whole agreement of the parties and their agents and representatives and anything not contained herein shall not be binding upon Lessor.

which Mr. and Mrs. Mihalovich had brought against them, or to cooperate in its defense—is even more fragile than the first. It was our impression from the colloquy appearing in the statement of facts that the trial court was satisfied that there had been no proof of a failure to give notice after the accident or to cooperate in the defense of the action brought by Mr. and Mrs. Mihalovich; however, the finding was made that Mr. Harris failed "to give notice of the accident as required by said insurance contract" (the Guaranty-Acoma policy), which finding was made a basis for the judgment of nonliability of Guaranty. There is no evidence to substantiate the finding.

It is unnecessary to consider the issue raised as to whether Guaranty was estopped to maintain this action.

The judgment is reversed with directions to dismiss the declaratory judgment action. Both appellants will recover their costs against Guaranty National Insurance Company, a corporation, on this appeal.

FINLEY, C. J., DONWORTH, HUNTER, and NEILL, JJ., concur.