606 P.2d 1334

Joe TORIX, Larry Torix, Steve R. Torix, and Terry Torix, dba Joe Torix & Sons, Plaintiffs-Appellants,

v.

Chall ALLRED and Feeders Grain Supply, Inc., a corporation, dba Burley Butte Custom Feedlot, Defendants-Respondents.

No. 12902.

Supreme Court of Idaho.

Feb. 20, 1980.

Roger D. Ling of Ling & Nielsen, Rupert, for plaintiffs-appellants.

William A. Parsons of Parsons & Smith, Burley, for defendants-respondents.

BAKES, Justice.

In this action the appellant cattle owners seek to recover $63,070.61 from the respondent custom feeder for cattle sold to an insolvent meat packer. Appellants appeal from a judgment in favor of respondents entered following a court trial. We affirm.

Joe Torix and his sons, Larry, Steve and Terry, were engaged in a farming and cattle operation known as Joe Torix and Sons.

Defendant respondent Chall Allred is the president, general manager and major stockholder of Feeders Grain Supply, Inc. This corporation operates a feed mill and also operates a custom feedlot under the name of Burley Butte Custom Feedlot in which cattle owned both by Allred and by others were fattened for marketing to meat packing plants.

In the spring of 1975 Torix contacted Allred and arranged for Allred to feed the Torix cattle at Allred's custom feedlot until the animals were ready for market. Torix agreed to pay a set fee for the feed and yardage. Allred agreed to finance these feed and yardage costs until the cattle were sold. In April or May of 1975 Torix delivered to the feedlot approximately 500 head of feeder cattle.

There was conflicting testimony by appellant Torix and respondent Allred concerning the role Allred was to take in the eventual marketing of the animals. However, the trial court found that Allred, without any additional consideration, agreed to advise its feedlot customers of available markets for their cattle and that Allred did advise Torix of prospective buyers when the Torix animals became ready for market.

The animals delivered to the Torix feedlot were ready to market in October and November of 1975. Without the assistance of Allred, Torix personally sold some of the cattle to Magic Valley Packing Company and Independent Meat Company. These companies paid Torix with checks payable directly to him. Torix, however, used most of the proceeds from these sales to pay Allred for feeding costs.

Later in October Allred informed Torix that Armour and Co. was willing to purchase approximately 40 head of the Torix animals on a grade and yield basis by which the price would be determined after slaughter when the grade and yield was determined. Torix agreed to sell the animals to Armour on these terms. Allred arranged the sale on Torix's behalf, and Armour paid for the cattle with a check payable to Torix

and Burley Butte Custom Feedlot. Armour gave the check to Allred, who then forwarded it to Torix without an endorsement. Torix endorsed the check and returned it to Allred as payment on his feed bill. At this time Torix advised Allred that checks in payment for cattle should be made payable directly to him and that he would then make the payment on his account with Burley Butte. Torix, apparently dissatisfied with the price he had received from Armour, also instructed Allred not to sell any more cattle to Armour.

On November 1, 1975, Allred telephoned Torix, who was in Nevada at the time, and advised him that he was in contact with a buyer willing to purchase cattle on a grade and yield basis with a guaranteed minimum price of 42½¢ per pound. Allred had received the offer from Darrell Peck, a cattle buyer from Burley, Idaho, who was buying for Minch's Wholesale Meats of Red Bluff, California. Because Torix had never dealt with either Peck or Minch's, he requested Allred to arrange the sale of the cattle to Minch's at that price. No other terms of sale were discussed. Allred then arranged sale of 125 head of Torix's cattle to Minch's through Peck. Forty-one steers were shipped to California on November 2, another forty-one on November 3, and forty-three on November 8, 1975. The only documents issued in connection with the sale were receipts from Burley Butte Custom Feedlot for each of the three shipments.

The receipts indicated that the cattle sold were from lots "181 and 187—Torix." Under the feedlot's bookkeeping system the lot number indicates the owner of cattle. From the foregoing facts the trial court concluded that the Torix cattle were sold by Torix to Minch's and shipped by Burley Butte.

Since the cattle were sold on a grade and yield basis with a guaranteed minimum price, payment could not be made at the time the cattle were shipped but was to be made following their slaughter by Minch's when the grade and yield could be determined. Allred later received from Minch's four bill of sale drafts, each payable to "Burley Butte Feed Lot."[1] In total the drafts represented payment of $63,070.61 for the Torix cattle. Allred endorsed each of the drafts with the endorsement "Burley Butte Feedlot by Chall Allred" on a line designated for the seller's signature and deposited the drafts in a bank account maintained in the name of Burley Butte Custom Feedlot. This account was a general operating account for the feedlot business. All four drafts were later returned by Minch's bank for non-payment.[2] Allred then informed Peck that he had been unable to get payment from Minch's. Peck replied that he had contacted Minch's and assured Allred that he would be paid. Allred then deposited the four drafts in Burley Butte's bank account a second time.[3] However, the drafts were again dishonored

---

1. The trial court found that "[r]epresentative[s] of Minch made out the drafts in the name of only the Burley Butte Feed Lot. Burley Butte did not dictate nor direct the name of the payee on the four drafts."

2. The bank records indicate that Minch's bank in California received for collection the first draft on November 14, 1975, and on November 17 returned it because of non-payment to Allred's bank in Idaho, which received it on November 19, 1975. It is not clear from the record when the bank notified Allred that the draft had been returned unpaid. According to the bank records, Minch's California bank received the second draft on November 17 and returned it on November 18 to Allred's bank, which received it unpaid on November 24, 1975. The third and fourth drafts, according to

bank records, were received for collection by Minch's bank on November 21, 1975, and returned on November 24 to Allred's bank, which received them unpaid on November 26, 1975.

3. According to bank records, the first draft was resubmitted by the Idaho bank to the California bank for collection on November 21, 1975, with instructions to "hold for three days if nec." The draft was again returned unpaid on November 23, 1975. The second draft was similarly resubmitted on November 24 and later returned unpaid on December 2, 1975. The third and fourth drafts were likewise resubmitted for collection on November 26 and were returned unpaid on December 4, 1975.

and shortly thereafter Minch's filed a voluntary petition of bankruptcy in California.

Allred had sold one other cattle shipment to Minch's in August of 1975 and had received payment by draft following the sale. No problems were encountered in that sale. Neither Allred nor Peck were aware of Minch's financial problems at the time of the sale of the Torix animals. However, Allred had not made any inquiries concerning Minch's financial condition prior to the sale of the Torix cattle to Minch's. Allred's testimony was that since Minch's had been in business for several years and had not exhibited any financial difficulties in the past, he did not feel compelled to inquire about the company's solvency. Likewise, Torix had not expressed any concern about selling the animals in exchange for Minch's drafts prior to the sale.

After Allred had shipped the cattle to Minch's but before its drafts had been returned for non-payment, Torix authorized Allred to arrange sale of the remainder of his cattle to John Clay & Co. Allred received payment for the cattle with a draft payable to Burley Butte Custom Feedlot. Burley Butte negotiated the draft and deposited the proceeds in its bank account and the proceeds were applied as a credit on Torix's feed bill.

After the drafts from Minch's had been returned for the second time, Allred notified Torix of the problems in obtaining payment. In the latter part of November Torix, Allred and other cattlemen who had sold cattle to Minch's and had been unable to collect on Minch's drafts or checks met in California with representatives of Minch's. They were unsuccessful in obtaining any payment. Allred later filed a proof of claim with the bankruptcy court in California on his own behalf and on behalf of Torix. The record indicates that neither party was able to recover any payment for the cattle from the trustee in bankruptcy at the time of trial.

In February, 1976, Torix filed suit against Allred seeking recovery of $63,-070.61, alleging that Allred had breached an agency contract with Torix by arranging a credit sale of the Torix cattle without Torix's express approval and that Allred had negligently failed to use due care in arranging the sale to Minch's. Allred answered, denying the allegations, and also filed a counterclaim for $15,073.40, which he claimed Torix owed for feed and services. Torix's sons, Larry, Steve and Terry, were later added as plaintiffs and Feeders Grain Supply, Inc., was made a defendant. Torix admitted that he owed Allred $15,073.40, but claimed that sum as an offset against his claim for damages. Following a court trial, the district court entered judgment in favor of Allred and against Torix for $17,513.40 for principal and interest, plus costs and attorney fees of $3,317.95. Torix brings this appeal from that judgment.

The trial court found that Allred, through Burley Butte, was principally engaged in a cattle feeding operation and that Burley Butte, in addition, "without any additional consideration, advised its customers of available markets for the cattle. Burley Butte advised Torix of prospective buyers of the Torix cattle." The trial court found that Allred sought and received Torix's approval for the terms and conditions of the sale to Minch's before arranging shipment from the feedlot and that Allred "did not allow any cattle to be shipped from its lot, that were owned by Torix, without the consent of Torix." The court stated that the evidence before it showed that Torix approved the price in the sales to Minch's and that "Torix did not demand or prescribe any terms and conditions of sale except as to grade and yield and a minimum guaranteed price on the 125 head of cattle shipped to Minch."

The trial court further found that payment by draft was customarily used in 1975 as a method of payment in the livestock industry, particularly in payment for cattle sold on a grade and yield basis, that Torix had not instructed Allred to demand payment in legal tender when he authorized

the sale to Minch's, and that Allred had no reason to know that Minch's was insolvent in November, 1975, when the sales were made. The court also held that Minch's made the payment drafts out to Burley Butte, as payee, on its own accord and not at Allred's instruction, and that Allred negotiated these drafts in Burley Butte's name in a good faith effort to effect collection of the proceeds, with an intent to credit Torix with the proceeds when received.

In its conclusions of law, the district court determined that Allred and Burley Butte fed and prepared Torix cattle for market as a "bailee for hire" and that Allred's assistance to Torix in making available marketing information was merely incidental to the primary undertaking to fatten the animals. The court held that Torix, not Allred or Burley Butte, sold the animals to Minch's and that Allred and Burley Butte merely shipped the animals to Minch's with the permission of Torix. The court concluded that Allred and Burley Butte served as "accommodation bailees" in shipping the animals for Torix and that they "at all times exercised reasonable care, diligence, and judgment in caring for and shipping the Torix cattle and, as a result, are not liable to Torix for any loss that may have been sustained on the cattle."

■ The trial court in this case made detailed findings of fact following the trial. Upon appellant Torix's motion, the court subsequently entered amended findings of fact and conclusions of law which incorporated many of the changes proposed by Torix. Findings of fact entered by the district court will not be set aside on appeal unless they are clearly erroneous. I.R.C.P. 52(a); *Dunn v. Baugh,* 95 Idaho 236, 506 P.2d 463 (1973). The arrangements between Allred and Torix with respect to the marketing of the animals were all oral and, although the parties disagreed at trial about the meaning of what they said, there was little actual dispute about how the transaction was arranged. The interpretation of the parties' agreement is, in these circumstances, a question of fact to be determined by the trial court and, on appeal, this Court will not set aside those findings unless they are clearly erroneous. *See Glenn Dick Equipment Co. v. Galey Construction, Inc.,* 97 Idaho 216, 541 P.2d 1184 (1975).

Appellant Torix's principal argument on appeal is that the trial court erred in refusing to find that the defendant Chall Allred was an agent of Torix's in conducting the sale of Torix's cattle to Minch's. It is Torix's contention that Allred, in accepting drafts in lieu of cash or checks for the animals, and in attempting to collect payment upon those drafts in the defendant's own name, acted beyond the scope of the authority given to Allred as an agent. Torix argues that Allred breached the fiduciary duties to Torix which an agent owes his principal and that, therefore, the trial court erred in failing to find Allred liable to Torix for the sale price of the animals.

■ Our examination of the records indicates that the trial court did not err in characterizing the relationship between Torix and Allred as a bailment and in finding that Allred, as bailee, was not liable to Torix for the loss which resulted from Minch's insolvency. Bailment has been defined as:

"A delivery of goods or personal property, by one person to another, in trust for the execution of a special object upon or in relation to such goods, beneficial either to the bailor or bailee or both, and upon a contract, express or implied, to perform the trust and carry out such object, and thereupon either to redeliver the goods to the bailor or otherwise dispose of the same in conformity with the purpose of the trust." *Loomis v. Imperial Motors, Inc.,* 88 Idaho 74, 396 P.2d 467 (1964), *quoting Fulcher v. State,* 32 Tex.Cr.R. 621, 25 S.W. 625 (1894).

The record supports a finding that Allred possessed Torix's animals as a bailee for the sole purposes of feeding the animals in

preparation for marketing them and making arrangements for shipping the animals upon Torix's instructions.

A bailee is not an insurer of the bailed property in the absence of an express agreement between the parties to that effect. The bailee's liability arises only from some act of negligence on his part. *Low v. Park Price Co.*, 95 Idaho 91, 503 P.2d 291 (1972); *Carson v. Bye*, 79 Idaho 495, 321 P.2d 604 (1958); *Brown v. Wells*, 66 Wash.2d 522, 403 P.2d 846 (1965); 8 Am. Jur.2d, Bailments § 198 (1963). The trial court in this case held that the defendant at all times exercised reasonable care, diligence, and judgment in caring for and shipping the Torix cattle. The evidence in the record amply supports this finding. As a result, the trial court's conclusion that the defendant as a bailee is not liable for the loss suffered by appellant Torix as a result of the insolvency of Minch's, the buyer of the cattle, is affirmed.

The appellants also contend that the trial court erred in not finding Allred liable for the conversion of the Torix cattle. The tort conversion requires a " 'distinct act of dominion wrongfully exerted over another's personal property in denial or inconsistent with his rights therein . . . .' " *Klam v. Koppel*, 63 Idaho 171, 179, 118 P.2d 729, 732 (1941), *quoting Schlieff v. Bistline*, 52 Idaho 353, 357, 15 P.2d 726 (1932); *see Warm Springs Properties, Inc. v. Andora Villa, Inc.*, 96 Idaho 270, 526 P.2d 1106 (1974). Here, Torix placed Allred in possession of the cattle and specifically authorized Allred to sell the cattle to Minch's. The shipping receipts issued by Allred in connection with this sale indicated that the cattle sold and shipped belonged to Torix. We agree, therefore with the trial court's conclusion that the appellants failed to establish that Allred had wrongfully exerted dominion over the Torix cattle.

Appellants next maintain that the trial court erred in not finding Allred liable for conversion of the proceeds of the sale, arguing that Allred exerted wrongful dominion over those proceeds by depositing Minch's drafts in the general account of Burley Butte for collection. However, the trial court found that Allred, for Burley Butte, endorsed the drafts and deposited them in the Burley Butte account in an effort to receive payment for credit to Torix. To establish conversion of bailed property by a bailee, it is necessary to prove that the bailee had in some way, by words or conduct, decisively indicated a repudiation of the owner's right to his property. *See, e. g., Weisberg v. Loughridge*, 253 Cal. App.2d 416, 61 Cal.Rptr. 563 (1967); *Guaranty National Insurance Co. v. Mihalovich*, 72 Wash.2d 704, 435 P.2d 648 (1967); Restatement, Second, Torts, § 237 (1965).

We agree with the trial court that Allred's actions in attempting to effect collection of Minch's drafts did not constitute a wrongful repudiation of Torix's rights to the sale proceeds. Allred at no time indicated an intention, either by words or conduct, to deprive Torix of the proceeds of the sale. Allred complied with what the record shows to be the practice of the cattle industry in depositing Minch's drafts to the Burley Butte account for collection, with an intention to credit Torix with the proceeds when received.[4]

The trial court, in addition to granting judgment in favor of the respondents on the appellants' action and on the respondent's counterclaim, awarded the respondents attorney fees without indicating any reasons for that award. On appeal the appellants argue that that award of attorney fees was discretionary and therefore the trial court was obligated to state its reasons for giving that award. I.C. § 12–120(2) provides:

---

4. The record indicates that had Allred endorsed the drafts on behalf of Burley Butte and forwarded them to Torix for deposit in his own account, Torix would have been no more successful in collecting the proceeds from Minch's than was Allred. Further, this action would have delayed deposit of the drafts and initiation of the collection process and probably would have increased risk that the drafts would not be paid.

"12–120. ATTORNEY FEES IN CIVIL ACTIONS.—. . .

"(2) In any civil action to recover on an open account, account stated, note, bill, negotiable instrument, or contract relating to the purchase or sale of goods, wares, or merchandise, unless otherwise provided by law, the prevailing party shall be allowed a reasonable attorney fee to be set by the court, to be taxed and collected as costs."

The respondent's counterclaim was an action on an open account for sums Torix owed Burley Butte for feeding and caring for his cattle. As prevailing parties on that counterclaim the respondent was entitled to attorney fees as a matter of statutory right under I.C. § 12–120(2) and not merely in the court's discretion. The record indicates that the attorney fees awarded included not only the fees incurred in prosecuting the counterclaim but also the fees incurred in defending appellant's action. An award of attorney fees to the respondents for successfully defending against the appellant's action cannot be based on I.C. § 12–120(2), but nevertheless was proper under I.C. § 12–121.[5]

Affirmed. Costs to respondents.

DONALDSON, C. J., SHEPARD, J., and DUNLAP, J. Pro Tem., concur.

BISTLINE, Justice, dissenting.

There is no question but that the original arrangement for the feeding of the Torix cattle by Allred was a bailment, and no issue was raised as to whether Allred was negligent in caring for those cattle. The issues in this case, of which I feel Allred's treatment of the payments for those cattle to be dispositive, evolved from the sale of the Torix cattle by Allred. In my view, both the trial court and this Court err in their analysis of Allred's actions in receiving payment in his own name and depositing that payment in the account of Burley

Butte. The trial court apparently adopted the Allred characterization that he was merely trying to expedite turning the drafts into money, apparently on the basis that he found Allred to be acting in good faith. The court did not find or conclude from the evidence that Allred was in any way attempting to defraud or cheat Torix. With that I readily agree, but that does not preclude the application of well established principles of law.

First it is necessary to examine the relationship between Torix and Allred with regard to the disposition of the cattle. The trial court held that Allred was merely an accommodation bailee in selling the Torix cattle, and this Court does not discuss that holding. As one text states:

"[A] business institution which, within the scope of its business, makes a practice of acting gratuitously as bailee for its customers and holds itself out as possessing peculiar facilities for such services is, with respect to property left with it accordingly, more than a mere accommodation bailee, and should be held to the responsibilities of a bailee for hire, inasmuch as such services attract patronage." 8 Am.Jur.2d *Bailments* § 13 (1963).

Allred's marketing service to his customers, though he made no specific charge therefor, was a part of his business; as such, it was not a gratuitous accommodation. Moreover, as the testimony of Allred establishes, he used his position as marketeer of the Torix cattle as a vantage point for the collection of his bill against Torix. Torix testified that on one earlier occasion when Allred sold Torix cattle and appropriated the proceeds, Torix admonished Allred against such practice.

It is not necessary to decide whether the legal status of Allred was that of an agent authorized to sell, or a bailee with power to dispose of the bailed goods. Where goods are consigned by one to another with the understanding that the consignee shall ei-

**5.** The trial court's judgment, entered January 25, 1978, was prior to the effective date of I.R.C.P. 54(e) which presently concerns awards of attorney fees under I.C. § 12–121.

ther sell the goods and remit the price or return the goods, the bailee in such a case is an agent of the bailor. 8 Am.Jur.2d *Bailments* § 34 (1963). *See Globe Securities Co. v. Gardner Motor Co., Inc.*, 337 Mo. 177, 85 S.W.2d 561 (1935); Anno., 175 A.L.R. 1366 at 1387 (1948). Whether as agent or bailee, Allred's duty to Torix in making the sale was that of ordinary and reasonable care. *See, e. g.*, Restatement (Second) of Agency § 379 (1958) (agency); 8 Am.Jur.2d *Bailments* § 198 (1963) (bailments). Accordingly there is merit in the Torix contention that Allred acted improperly in releasing the cattle in return for a promise of drafts. That issue, however, is of secondary importance to the issue presented by Allred's exercise of an owner's dominion over the drafts.

Torix contends that Allred acted improperly in receiving payment for the Torix cattle by drafts payable to Burley Butte and by depositing those drafts in Allred's own Burley Butte bank account. Unless the parties have agreed otherwise, an agent holding things on behalf of his principal has the duty not to deal with them so that they will appear to be his own or to mingle them with his own things. Restatement (Second) of Agency § 398 (1958). Ordinarily, without authorization to the contrary, this means that an agent who receives money on account of the principal may not properly place it to his own credit in a bank or so mingle it with his own money that there could be difficulty in tracing it. *Id.* at Comment b. The same principles hold for bailees. 8 C.J.S. *Bailments* § 31 (1962). It is well established, for instance, that attorneys and brokers must assiduously guard against the appropriation or commingling of a client's funds. Allred, as with any other agent, should be held accountable for a breach of a fiduciary's obligations.

I am unable to bring myself to the Court's conclusion that Allred's receiving and depositing the drafts to his own Burley Butte account did not amount to a conversion. As the Court's opinion concedes,

Allred did this in an effort to ensure that he, not Torix, would be the one receiving payment for the cattle, which he would then appropriate while giving credit on Torix's account. Allred's testimony shows that he had no intention of handing any money whatever over to Torix until the feed bill was fully paid by those monies.

"Q Yes, did you ever intend to apply the proceeds from the sale of Torix' cattle to your own benefit?

"A No, we intended to apply it to his account, to his feed bill, which we did.

. . . . .

"Q Is it a custom and practice in your feed lot, that methods of payment are frequently paid to you with just the feed lot's name on them?

"A Yes, in some instances.

"Q Is it very common?

"A Yes.

. . . . .

"Q And in fact the receipt of the money, had the draft that you accepted been honored, in your own name, was in fact a benefit to you, was it not, because it paid or would have given you the funds to pay yourself, your feed bill?

"A It would apply to pay Mr. Torix' feed bill, yes.

"Q And so to that extent, when you said you had no intent to apply the proceeds to your own benefit, you mean to say you did not intend to apply the proceeds to your own benefit except to the extent of the money that you had coming from Mr. Torix?

"A Yes, we would have only applied—

"Q But to that extent it was certainly for your benefit rather than anyone else's to get it into your bank account?

"A It was to our benefit as well as to Mr. Torix', yes."

As has been pointed out, neither an agent nor a bailee has any right to take funds belonging to the principal. An agent who

has received money for his principal has a duty to deliver that money to the principal. *See* Restatement (Second) of Agency § 427 (1958). Allred commandeered the drafts from Minch's for his own benefit. Had the drafts not been dishonored, Allred admittedly was not about to turn the Minch payment over to Torix until such point as there was an excess over and above the feed bill. In effect, Allred was channeling those drafts to his own account and thereby unauthorizedly taking payment of Torix's feed bill. Only when the drafts were dishonored did he characterize his conduct in accepting the drafts as a mere expedient for the benefit of Torix. The legal effect of Allred's conduct cannot be so easily avoided. An agent may not take payment due his principal in his own name for application on a debt owed him by the principal and subsequently, after it has been dishonored, successfully maintain that the payment really at all times belonged to the principal.[1]

Although Allred may be correct in his assertion that the loss here suffered was occasioned by Minch's insolvency, and not by the manner in which the drafts were handled, it does not necessarily follow that he wholly escapes responsibility if his actions were such as to give rise to a conversion.[2]

Clearly Allred appropriated the drafts to himself as payment on Torix's feed bill. Such an appropriation was an unauthorized dominion over drafts belonging to Torix, and as such was an act of conversion. In essence, Allred effected a unilateral novation, totally unauthorized by Torix. At that point in time he must be held to have assumed the risk of any loss that might result from nonpayment of Minch's drafts. That Allred so understood the consequences of his own conduct is conclusively demonstrated by his unsuccessfully explained filing of a creditor's claim in Minch's bankruptcy. It has often and wisely been said that a man's conduct speaks more forcefully than his words.

Allred voluntarily and unilaterally chose to accept and look to those Minch drafts as payment of the Torix feed bill. It was in that posture that he surrendered custody of the cattle—thereby also choosing to surrender his own claim of an agister's lien thereon. At worst the dishonored drafts, to the extent of the Torix feed bill, should be an Allred loss. At best Torix should recover across the board the amount of the dishonored drafts, less any amount owed Allred for caring for the cattle and supplying feed.

I respectfully dissent.

---

1. Following the Minch transaction, Allred sold another load of cattle for Torix to John Clay & Co. for $20,631.83. The payment for this was also made out to Burley Butte and was also appropriated by Burley Butte, credit being applied to the feed bill. Again Torix never saw any money from this sale.

2. In *Bank of British North America v. Cooper*, 137 U.S. 473, 11 S.Ct. 160, 34 L.Ed. 759 (1890), the defendant-agent alleged that even had he followed his principal's instructions, the same losses to the principal would have occurred. It being uncertain whether this was so, the Court refused to allow the wrongdoer to escape liability on the possibility that the same loss might have occurred anyway:

> "In view of the manifold contingencies of business transactions, and the wide range of possibilities that attend any act of a commercial nature, few things could be more unfortunate than to incorporate into established law the right of an agent to disobey specific instructions, and to make a guess as to results an excuse for relief from accruing loss." *Id.* at 479, 11 S.Ct. at 162.