692 P.2d 337

Jose A. LUZAR and Jose Martin Elexpu-
ree, dba Joe & Martin Trucking,
Plaintiffs-Respondents,

v.

WESTERN SURETY COMPANY, a
South Dakota corporation,
Defendant-Appellant.

No. 15425.

Supreme Court of Idaho.

Nov. 15, 1984.

Rehearing Denied Dec. 28, 1984.

Thomas B. High, of Benoit, Alexander & Sinclair, Twin Falls, for defendant-appellant Western Surety Co.

Lloyd J. Webb, of Webb, Burton, Carlson, Pedersen & Paine, Twin Falls, for plaintiffs-respondents.

HUNTLEY, Justice.

We granted a petition to review a decision of the Court of Appeals which reversed a jury verdict in favor of plaintiffs on a cause of action for conversion of personal property which was pledged as collateral. We set aside the decision of the Court of Appeals, 106 Idaho 1, 674 P.2d 430, and affirm the judgment of the trial court.

Plaintiffs Luzar and Elexpuree are partners doing business as Joe & Martin Trucking, who operate as "track buyers", buying, transporting, and reselling hay. In 1975 Joe & Martin Trucking obtained a track buyer's bond, required by a statute, from defendant Western Surety, insuring any claims against Joe & Martin Trucking to a limit of $10,000. Subsequently, Joe & Martin Trucking also obtained Oregon and Washington fuel tax bonds and were required by Western Surety to pledge as collateral $1,500 in certificates of deposit. Approximately 1 and ½ years after the initial track buyer's bond was effective, Western Surety notified Joe & Martin Trucking that a $10,000 certificate of deposit must be pledged as collateral on the track buyer's bond as well. Western Surety's agent told Joe & Martin Trucking that

"they usually release it (the collateral) after two or three years." Joe & Martin Trucking complied with the demand and delivered to Western Surety the additional $10,000 certificate of deposit. Concurrent with each pledge, the parties executed a security agreement which provided in part:

FIRST: That the Surety shall have the right in its discretion to retain said collateral or the proceeds thereof until the liability of the Surety on account of having executed said bond or any continuance or renewal thereof, or any other or different bond or bonds or undertakings issued for the Depositor, or at his request shall cease and determine.

. . . .

SEVENTH: In case of the termination of the liability of the Surety, without loss or damage or expense as aforesaid, on said bond and any other bond or bonds or undertakings which the Surety may have issued before or after said bond at the request of or on behalf of the Depositor, and competent evidence is furnished by the Depositor to the effect, the said collateral shall be returned thereupon to the Depositor upon the surrender of this instrument properly endorsed by the Depositor to show the receipt of said collateral.

Joe & Martin Trucking obtained substitute bonds on May 7, 1979, with a different insurance company which did not require collateral. On the suggestion of Western Surety's agent, Joe & Martin Trucking did not cancel the Western Surety's track buyer's bond until May 31, 1980, since the premium had already been paid for the year. After cancellation, Joe & Martin Trucking made repeated inquiries to Western Surety's agent and also contacted Western's California office in order to determine how it could obtain release of the collateral. At trial the parties stipulated that on June 6, 1980, Joe & Martin Trucking made a written demand for the return of the collateral:

[O]ffering to display to the defendant that all of the plaintiff's growers-customers had been paid and that the affidavits

to that effect from all of the customers with whom the plaintiffs had done business in the last two years could be obtained if the company desired; that there were no claims against the plaintiffs' books available to the defendant for the defendant's study and to determine whether that contention was correct; and further stipulated that on the 9th day of June, 1980, that demand letter was received by the defendant and that on the 17th day of June, 1980, the demand letter was rejected and the company advised counsel for the plaintiffs that it was the company's policy to retain collateral for six months following the termination of the bond.

Before the six months expired, Joe & Martin Trucking sued for conversion of the collateral. At trial, Western Surety relied entirely upon the security agreements as justification for retaining the collateral. Western Surety argued that paragraph "First" of the agreements gives it the right to retain the collateral after cancellation of the bond until the four or five year statute of limitations has run.

At trial, the jury returned a verdict in favor of Joe & Martin Trucking awarding $11,500 for the collateral, $65,000 in general damages, and $11,500 for punitive damages. The trial court also awarded attorney fees pursuant to I.C. § 41–1839. The Court of Appeals reversed the jury verdict on the basis that the collateral agreement clearly gave Western Surety the right to retain the collateral, implicitly finding that the contract terms were not ambiguous as a matter of law. The court remanded with directions to the trial court to grant judgment in favor of Western Surety. This Court granted a petition to review the case.

I

Joe & Martin Trucking argues that the trial court's judgment should be affirmed. Western Surety argues that the jury instructions were improper because the issue of the reasonableness of the retention of certificates of deposit was included therein as an element of conversion; that the con-

struction of the security agreement contract should have been a question for the court and not the jury; and that the terms of the contract entitle appellant to retain the certificates of deposit after cancellation of the bonds.

■ "Conversion" has been defined as "a distinct act of dominion wrongfully asserted over another's personal property in denial [of] or inconsistent with [the] rights therein." *Torix v. Allred*, 100 Idaho 905, 910, 606 P.2d 1334, 1339 (1980). A cause of action for conversion is a remedy available to a pledgor against a secured party-pledgee who refuses to return the collateral if a security agreement does not give a legal right to retain the collateral after a demand for return by the pledgor. *See Nora v. Safeco Insurance Co.*, 99 Idaho 60, 577 P.2d 347 (1978); 69 Am.Jur.2d., Secured Transactions § 244 (1973). If at the time the pledgor makes the demand for the return of the collateral, the secured party has a contractual right to continue to retain the collateral, then its refusal to return the collateral would not be an "act of dominion wrongfully asserted." If, however, the pledgor makes a rightful and reasonable demand for return of the collateral, the pledgee must act reasonably in either returning the collateral or in refusing to do so. *See* Prosser, Law of Torts (1971) at 90. *The Second Restatement of Torts*, § 222A(2) (1965) cites the following elements for consideration "[I]n determining the seriousness of the interference and the justice of requiring the actor to pay full value ...":

(a) The extent and duration of the actor's exercise of dominion or control;

(b) The actor's intent to assert a right in fact inconsistent with the other's right of control;

(c) The actor's good faith;

(d) The extent and duration of the resulting interference with the other's right of control;

(e) The harm done to the chattel;

(f) The inconvenience and expense caused to the other.

■ Reasonableness becomes an issue in conversion after demand and notice to pledgee, and pertains, among other things, to the good faith of the pledgee in dealing with the collateral thereafter. Good faith and fair dealing are implied obligations of every contract.

■ In the case of a pledge, where the secured party takes possession of the collateral, a written security agreement is not required, *see* I.C. § 28–9–203(1)(a), but a written security agreement, as we have in the present case, will establish the contractual rights and obligations of the parties. Whether conversion exists in the present case depends on the interpretation and legal effect of the security agreement.

Western contends that the written security agreements gave it the legal right to retain the collateral; and that reasonableness or unreasonableness of its retention is not the standard for conversion rendering instructions addressing reasonableness improper.

The agreements in the instant case clearly gave Western Surety "the right in its discretion to retain said collateral." However, that right and discretion exist only "until liability of the surety on account of having executed said bond ... shall cease and determine." This latter statement makes Western Surety's retention rights contingent on its liability on the track buyer's bond, and thereby incorporates by reference all the terms of the bond agreement, including "the provisions of Title 22, ch. 14, Idaho Code." Therefore, in addition to the security agreement, we may look to the terms of the bond and the relevant statutes to determine when liability on the bond "cease[s] and determine[s]."

The bond is required "to secure the faithful performance of his [track buyer's] obligations," including the obligations incurred "under contracts with respective producers or warehousemen of farm products." I.C. § 22–1406. The surety is liable to any "person or warehouseman injured by the breach of any obligation" of the track buyer up to the limits of the bond. I.C.

§ 22–1407. The bond states that cancellation of the bond "shall not affect any liability that shall have accrued under this bond prior to the effective date of cancellation." From these references we conclude as a matter of law that the "liability of the surety [Western] on account of having executed said bond ... cease[s] and determine[s]" at the time when Joe & Martin Trucking has fully performed all its obligations to suppliers and producers incurred prior to cancellation of the bond. Since the breach of such obligation may not have become known until after cancellation of the bond, the liability extended beyond cancellation of the bond, and therefore the collateral could be retained beyond cancellation until all obligations of Joe & Martin Trucking are fully performed.

Western contends that its liability on the bond is terminated only by the expiration of the four or five year statute of limitations after cancellation of the bond, and that it has discretion to retain the collateral until that time. The statute of limitations expiration may render existing liabilities unenforceable, but the contract also provides for a possible earlier termination of liability through the full performance by Joe & Martin Trucking of all of their obligations to suppliers. Liability on the bond would "cease and determine" on the occurence of the first of either the statute running or the obligations being fulfilled. Accordingly, Western Surety's assertion that the agreement, as a matter of law, gives it the right to hold the security until the statute of limitations has run is incorrect.

■ Paragraph "SEVENTH" provides the conditions upon which the collateral must be returned. It states, "In case of the termination of the liability of the Surety [which we have interpreted to mean the performance of all of Joe & Martin Trucking's obligations during the term of the bond] ... and competent evidence is furnished ... to that effect, the said collateral shall be returned ...." We find as a matter of law that the term "competent" evidence · is ambiguous. Nowhere in the agreement is it defined or explained. Neither is it a term of common usage which an average person would be able to define. *Foster v. Johnstone*, 84 ISCR 841, 685 P.2d 802 (1984).

■ The interpretation and legal effect of an unambiguous contract are questions of law to be resolved by the court rather than the jury. *Clark v. St. Paul Property & Liability Insurance Co.*, 102 Idaho 756, 639 P.2d 454 (1981). However, if the court determines that a contractual term is ambiguous, then the term's "interpretation presents a question of fact" for the jury. *Pocatello Industrial Park Co. v. Steel West, Inc.*, 101 Idaho 783, 789, 621 P.2d 399 (1980). The primary consideration in interpreting an ambiguous term of a contract is a determination of the intentions of the parties, which intentions are to be gleaned from all of the evidence. If the court or jury is unable to determine the intent of the parties, then the ambiguity should be resolved against the party who used the ambiguity in drafting the contract. *Werry v. Phillips Petroleum Co.*, 97 Idaho 130, 540 P.2d 792 (1975); *Big Butte Ranch, Inc. v. Grasmick*, 91 Idaho 6, 415 P.2d 48 (1966). Since the term "competent evidence" is not a term of common usage, is not explained or defined within the agreement, and is subject to different interpretations, it is a question of fact to be submitted to the jury.

■ The trial court's jury instructions, numbers 11, 12, and 13, on interpreting the contracts and ambiguous language, do not explicitly direct the jury to consider the term "competent evidence." Nevertheless, the jury heard extensive testimony during which evidence of the meaning of the phrase "competent evidence", and the adequacy of the evidence provided by respondents, was presented. Clearly, the interpretation of the phrase "competent evidence" was at issue. The requirement that the jury determine whether or not Joe & Martin Trucking submitted "competent evidence", and the legal implication of their factual findings, were implicit in the trial court's specific contract instructions and in

the instructions as a whole. Where, considering the instructions in connection with one another and without straining the language, "the charge harmonizes as a whole and fairly and accurately states the law," the judgment of the trial court should not be disturbed. *Shook v. Beals*, 96 Cal. App.2d 963, 217 P.2d 56, (1950).

■ Western Surety challenges the instructions on conversion, particularly numbers 5, 6, and 7, on the ground that they are not appropriate where a written agreement exists. In fact these instructions did not preclude the jury from considering each party's contractually established rights and obligations. They simply clarify, within the framework of the written agreements, issues important for the jury's focus—elements of conversion, purpose of the pledge, and reasons for and conditions of retention of the pledge. The written agreements do govern with respect to these issues, a point which is implicit in the instructions construed as a whole.

■ The giving of an erroneous instruction does not justify the granting of a new trial unless the appellant can establish that he was prejudiced thereby, and that the error affected the jury's conclusion. *Nelson v. Mueller*, 85 Wash.2d 234, 533 P.2d 383 (1975), *accord Archer v. Shields Lumber Co.*, 91 Idaho 861, 434 P.2d 79 (1967). In the case before us the jury found for Joe & Martin Trucking, and the trial court denied motions by Western Surety for a judgment notwithstanding the verdict or for a new trial. There is no indication that Western Surety was prejudiced by the instructions, or that, considering the evidence before it, the jury's verdict would have altered had the jury instructions been different.

## II

■ Western Surety argues that Joe & Martin Trucking failed to prove the damages to a reasonable degree of certainty. At trial Mr. Luzar testified that the deprivation of the collateral caused the business to become undercapitalized. Without the additional capital, Luzar claimed that he was unable to buy and resell hay as a normal track buyer but was forced to merely haul hay for a fee. Luzar testified that with the collateral he could have purchased and resold 5,000 tons of hay, which he otherwise was only able to haul for a fee. This would have netted an additional $2.00 per ton, or $10,000. He also testified that he could have bought and resold an additional 5,000 tons of hay at a net profit of $6.00 per ton, or $30,000, for a total of $40,000 in lost profits. This evidence alone would be inadequate proof of damages as a result of lost profits. *McComber v. Nucklos*, 82 Idaho 280, 353 P.2d 398 (1960). However, this evidence was buttressed by the testimony of four farmers who testified that they would have been willing to sell their hay to respondents. One of Joe & Martin Trucking's competitors testified to the validity of the $6.00 net profit margin and the $2.00 extra profit in buying and reselling rather than in merely hauling hay. There was also testimony of lost opportunities to supply two large feedlot owners with hay. Respondents' Certified Public Accountant projected lost profits of $28,000 based on the assumption that expenses would be 43% of the gross revenue as they were in 1980. The C.P.A. also testified that the 43% expense figure was very conservative for the reason that, had the gross revenue not dropped, the percentage of expenses could have been as low as 28%, as they were in 1979, resulting in a much larger profit. Viewed by itself, the C.P. A.'s testimony is inadequate to prove lost profits beyond $28,000, but viewed in conjunction with the previous testimony it enhances the reasonable certainty of the $40,-000 figure. We hold that there was substantial and competent evidence presented at trial to support a finding of $40,000 in general damages. However, we find no evidence that proves lost profits to a reasonable degree of certainty beyond the $40,000 figure. There was no testimony of a lost profit figure higher than $40,000. In closing argument to the jury, Joe & Martin Trucking's counsel acknowledged that "all we are asking for is the $40,000 or the

$28,000 or something in between that is representative of what we could [have] done if we [had] had the $11,500." Accordingly, the compensatory damage figure is reduced from $65,000 to $40,000, and is affirmed in that amount.

■ Western Surety also argues that there is no evidence which could support the jury's finding of punitive damages. We disagree. The evidence shows that the respondents were inexperienced in bonds and collateral, but were honest, hardworking businessmen with an excellent credit reputation. Joe & Martin Trucking pledged collateral on the agent's inference that under usual circumstances the collateral is returned in two or three years. When Joe & Martin Trucking substituted another bond, Western's agent persuaded them not to cancel the Western bond for another year because the premium had already been paid. This resulted in a double bond coverage for over one year. When the bond was finally cancelled, respondents were unable to obtain, despite reasonable inquiries, any direction from Western Surety or its agent as to how to proceed to obtain return of the collateral. Western then rejected the tendered evidence and stated that its policy was to wait for six months, and gave no explanation of why the evidence was inadequate. At trial Western took another position, that it had complete discretion to retain the collateral for the entire running of the statute of limitations. From such a set of facts, a jury could reasonably infer that Western's actions were in bad faith and outrageous. The jury was properly instructed on the issue of punitive damages, and the award of $11,500 is not excessive.

### III

■ The final issue raised is whether respondents are entitled to attorney fees under I.C. § 41–1839, which states:

41–1839. Allowance of attorney fees in suits against insurers.—(1) Any insurer issuing any policy, certificate or contract of insurance, surety, guaranty or indemnity of any kind or nature whatsoever,

which shall fail for a period of thirty (30) days after proof of loss has been furnished as provided in such policy, certificate or contract, to pay to the person entitled thereto the amount justly due under such policy, certificate or contract, shall in any action thereafter brought against the insurer in any court in this state for recovery under the terms of the policy, certificate or contract, pay such further amount as the court shall adjudge reasonable as attorney's fees in such action.

There is no question that Western is an "insurer" which issued and required the security agreements as a condition to maintaining the bonds. Western failed for a period of thirty days to return the collateral after demand and proof was tendered. The present suit is one for conversion of collateral pledged pursuant to the security agreement, and therefore falls within the statute as an "action thereafter brought against the insurer ... for recovery under the terms of the policy, certificate or contract" (the security agreement). Respondents are entitled under I.C. § 41–1839 to reasonable attorney fees.

Costs and attorney fees to respondents.

DONALDSON, C.J., and SHEPARD and BISTLINE, JJ., concur.

BAKES, Justice, dissenting:

I dissent from the majority's conclusion in Part I that the trial court adequately instructed the jury. A review of the trial court's instructions reveals the ambiguity, confusion and prejudicial error created by the trial court when submitting the case to the jury on the instructions. The relevant instructions given to the jury were as follows: (3) conversion is the appropriation of another's personal property; (5) if the reason for retention of the collateral has expired, the retention is wrongful and amounts to conversion; (6) the pledgee may retain the collateral until the purposes of the pledge have been satisfied; (7) there is no conversion if the demand is unreasonable and defendant makes a qualified re-

fusal; (10) if the agreement gives a right to retain the collateral, there can be no conversion; (11) a contract must be construed as a whole according to its plain meaning; (12) all the ambiguities are to be resolved in favor of the customer; (13) the jury should judge whether the defendant acted "reasonably and justifiably" in interpreting the agreement; (19) surety breaches its covenant of good faith if it unreasonably denies or withholds funds due its customer.

The trial court did not even attempt to interpret and instruct the jury as a matter of law on the meaning of the unambiguous terms of the contract. The majority opinion has adequately interpreted the contract as a matter of law and focused on the critical factual issue of what was "competent evidence" within the meaning of the security agreement. However, the majority then goes on to attempt to justify the inadequate instructions by stating that:

"[c]learly, the interpretation of the phrase 'competent evidence' was at issue. The requirement that the jury determine whether or not Joe & Martin Trucking submitted 'competent evidence', and the legal implication of their factual findings, were implicit in the trial court's specific contract instructions and in the instructions as a whole." *Ante* at 342.

In viewing the substance of the relevant instructions listed above, I fail to see any one instruction or combination of instructions which even arguably instruct the jury to resolve the ambiguous term of "competent evidence" based upon the factual evidence. The trial court should have interpreted the security agreement as a matter of law, leaving the resolution of the ambiguous term "competent evidence" to the jury with a clear instruction to resolve the term based upon the factual evidence of the intentions of the parties.

In addition to the failure to give needed instructions, the given instructions seriously misstated the law. Instruction Numbers 5, 6 and 7, making conversion contingent upon the reason for the retention of the collateral, the purposes of the pledge, and the reasonableness of the demand for re-

turn, contradict the statement of law by majority that "[w]hether conversion exists in the present case depends on the interpretation and legal effect of the security agreement." *Ante* at 340. Instruction Numbers 5, 6 and 7 would only be proper in a conversion action where the reasons for retention, purposes of the pledge, and basis of a demand for return are not governed by a written instrument. *See Nora v. Safeco Insurance Co.*, 99 Idaho 60, 577 P.2d 347 (1978). Instruction Number 11, which leaves to the jury the interpretation of plain and unambiguous terms, conflicts with the majority's correct statement of law that "[t]he interpretation and legal effect of an unambiguous contract are questions of law to be resolved by the court rather than the jury. *Clark v. St. Paul Property & Liability Ins. Co.*, 102 Idaho 756, 639 P.2d 454 (1981)." Instruction Number 12, which required that all ambiguities in the contract be automatically resolved in favor of the customer, is also in error. The correct statement of law is that the jury should attempt to resolve the ambiguity based upon the factual evidence relevant to the intentions of the parties, and only if the ambiguity remains should the jury resolve the ambiguity against the maker as a last resort. The Idaho Jury Instructions § 615; Corbin on Contracts, § 559 (1960); Williston on Contracts, §§ 601, 621, 671 (1961).

A further basis for error in the instructions is that they are internally inconsistent. Instruction Numbers 7 and 13 make the alleged conversion contingent upon whether plaintiff's demand for return of the collateral was reasonable and whether the defendant reasonably interpreted the agreement. The majority interprets the "reasonable" requirements as nothing more than a contractual requirement of good faith. These instructions directly contradict the correct rule of law stated in Instruction Number 10 which makes the conversion contingent upon the contractual right to retain the collateral. No one questions the plaintiff's good faith in demanding the return of the collateral; however, it is entirely possible that plaintiff could have

demanded the return in good faith but still not be entitled to the return under the terms of the agreement. Just because good faith is an implied obligation to every contract does not mean that a good faith demand or retention of collateral justifies return or retention under the terms of the contract. The parties could be reasonable and dealing in good faith, but still be dead wrong. The jury could easily have been confused as to whether liability for conversion depended on: (1) the plaintiff's reasonableness or good faith in demanding return; (2) the defendant's reasonableness or good faith in interpreting the agreement or refusing to return; or (3) the rights to retain or return of the collateral as governed by the terms of the written agreement.

Viewing the instructions as a whole I cannot agree with the majority that the defendants have suffered no prejudicial error. "[W]here instructions are given which are contradictory on material matters ... the conflict between them and the resultant ambiguity and uncertainty constitutes prejudicial error and requires reversal." *Yacht Club Sales & Service, Inc. v. First National Bank of North Idaho*, 101 Idaho 852, 863, 623 P.2d 464, 475 (1980). In the present case the contradictory instructions combined with the erroneous instructions of the law and the failure to give material instructions also constitute prejudicial error. The case should be remanded for a new trial limited to the issue of liability. In that event I would concur with the majority's analysis in Parts II and III.